UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:17-CV-298-CHB-CHL

BRYAN TYLER BOERSTE,                                             Plaintiff,

v.

ELLIS TOWING, LLC, et al.,                                       Defendants.

MEMORANDUM OPINION AND ORDER

        Before the Court is the Motion for Leave of Court to Take the Deposition of Allie Fisher

filed by Plaintiff Bryan Tyler Boerste ("Boerste").  (DN 163.)  After a telephonic status conference

with the undersigned (DN 165), Defendants Ellis, LLC; Ellis Towing, LLC; Kevin Bewley; City

of Springfield; Springfield Police Department; Michael Cotton; Mattingly Security, Inc.; and

Joshua Baker (collectively, the "Defendants") filed a joint response (DN 172), and Boerste filed a

reply (DN 189).  Therefore, this matter is ripe for review.

        For the reasons set forth below, Boerste's motion (DN 163) is **DENIED**.

I.       BACKGROUND

    A.       Factual and Procedural Background

        On December 19, 2019, pursuant to this Court's prior order (DN 117), Boerste underwent

a neuropsychological evaluation administered by defense expert Dr. Thomas Sullivan ("Dr.

Sullivan").  (DN 163, at PageID # 4147.)  At that time, Boerste signed a Supervision Statement

(the "Supervision Statement") supplied by Dr. Sullivan that provided as follows:

        I am providing psychological services to you through the use of a supervisee. The
        supervisee's name is Allie Fisher. Ms. Fisher will be providing psychological
        testing to you. Following the evaluation, Ms. Fisher will provide me with the data
        generated. This will include behavioral observations, a summary of your statements
        made during the testing, and the testing results themselves. . . . [I] would be happy

to talk to you if you have concerns or comments about your interactions with Ms. Fisher.

(DN 163-1, at PageID # 4153.)

Boerste's counsel deposed Dr. Sullivan on May 14, 2020, one day before the close of expert discovery in this action.  (DN 163, at PageID # 4148-49.)  At his deposition, Dr. Sullivan testified as to Ms. Fisher's role in his evaluation in relevant part as follows:

| | |
|---|---|
| Mr. Hasken: | So describe this student that you brought with you. What was this student's name? |
| Dr. Sullivan: | My student's name this year is Allie Fisher, A-L-L-I-E. Her last name is, F-I-SH-E-R. So she's a -- she's a doctoral student from the University of Cincinnati. She works with me most Fridays. Her goal in coming here working with me is to learn how to administer a neuropsychological evaluation. |
| Mr. Hasken: | So you described her as a student. What are her qualifications? Is it just a student? |
| Dr. Sullivan: | Oh, she's -- she received a bachelor's degree at the University of Michigan, and she's currently working on her master's degree at the University of Cincinnati. |
| Mr. Hasken: | Do you know what master's degree she's working on? |
| Dr. Sullivan: | Yeah. She's working on her master's degree in clinical psychology. |

. . .

| | |
|---|---|
| Mr. Hasken: | . . . [I]f she gets a master's in clinical psychology, would she be able to ultimately perform – perform these neuropsychological evaluations on her own or would she need to perform those evaluations in conjunction with someone with a Ph.D.? |
| Dr. Sullivan: | The latter. You can't be independently licensed as a psychologist in Ohio with just a master's degree. |
| Mr. Hasken: | Why isn't Allie Fisher identified in your report? |
| Dr. Sullivan: | I don't think she did any of the work. |
| Mr. Hasken: | And when you say any of the work, you're referring to the evaluation itself, right? |
| Dr. Sullivan: | That's right. That's right. |

| | |
|---|---|
| Mr. Hasken: | So was she nothing more than a casual observer? |
| Dr. Sullivan: | No. She was a student observer. She was – her job was to watch me to see what to do with the patients. |
| Mr. Hasken: | And I'm sorry for using the word casual. I did not mean to not take into account her education, experience. I just meant – I think you answered this, was just wondering if she was observing or if she was helping administer any of the tests, and it sounds like she was just there to observe the evaluation, right? |
| Dr. Sullivan: | Yeah. That was – her primary role was to observe the evaluation. She may have scored some of the materials. I don't notice her handwriting on any of the Bates stamped documents that you got. My handwriting is terrible, so it's pretty easy to discriminate who wrote what. But the way Tyler did the MMPI is he had a booklet, and he had a score sheet, and he filled in a bubble sheet about his answers. And then somebody from my office, either me or Allie, put his answers into a computer program, sent those answers to Minnesota, they were scored and then they were sent back. So it's possible that Allie keyed in his answers to the MMPI. |
| Mr. Hasken: | And this scoring of the MMPI would have been done after the evaluation was over and Tyler left, right? |
| Dr. Sullivan: | That's true. |

. . .

| | |
|---|---|
| Mr. Hasken: | [D]r. Sullivan, before we took our last break, I was asking about your clinical practice and your forensic practice. I forgot to ask you about your – your teaching.  Your CV indicates that you were an adjunct professor at Xavier University, Wright State University and the University of Cincinnati. How does that fit into your schedule in terms of you seeing patients? And we'll talk about the pre-COVID-19 world. |
| Dr. Sullivan: | My work with the University of Cincinnati is they place students here with me. It's usually one student a year usually one day a week usually on Friday because students are interested in legal – legal evaluations, and it works well with their schedule. So my adjunct status with the University of Cincinnati consists primarily of supervising one student a week all day on Friday. This year coming up I have a student on Friday, and then I have an advanced student who is going to be here like Mondays and Tuesdays. And mostly what |

they do is they observe what I do. And then when they get up to speed, what I do is usually after a student is here a couple of months if they are competent, I have them do a test with somebody while I supervise. And then as they get more and more skills, they're able to do more and more of the assessment materials. Over the course of the years, I'm in the room with the student at least 99.9 percent of the time, so it's – it's exceedingly unusual for the student to be in a room with a patient and me not in there. Usually it's when I have to go to the bathroom. . . .

. . .

Mr. Hasken:     So – so your trainee, Allie Fisher, she would have been an example of one of these students from the University of Cincinnati who was assigned to you to work with you on Fridays, and she would go attend forensic examinations?

Dr. Sullivan:   Yeah. Anything I do on Friday, she comes with me. And then usually the students they're very interested in, you know, professional athletes. So if I see somebody on Saturday, they come with me. Or if I go down there at 6:00 in the morning, they come with me, that type of thing.

. . .

Mr. Hasken:     [D]o you charge extra when a student attends with you?

Dr. Sullivan:   No.

Mr. Hasken:     So essentially that student like Allie Fisher it's just a part of her education she's coming with you. She doesn't get compensated for being there for a forensic consult?

Dr. Sullivan:   Not usually. Allie was more toward the beginning of her placement. I have paid students if they, you know, provide a lot of benefit to a particular case. But usually it's – usually it costs me more to have a student than, you know, it's worth.

(DN 172-1, at PageID # 4233-37, 4340-45).

Dr. Sullivan also testified about his conclusions regarding Boerste's untruthfulness and insufficient effort. Dr. Sullivan testified that he based those conclusions on the data from the evaluation, not intuition from subjective perceptions. (*Id*. at 4254, 4259.) He highlighted that the problem with relying on psychologist's observations is they cannot be tested, making their

4

reliability and validity unknown.  (*Id.* at 4252.)  He testified he did not even partially rely on subjective perceptions from the evaluation but instead on malingering tests that have been validated and shown to be reliable via scientific study.  (*Id.* at 4252-254.)  However, Dr. Sullivan did also testify about his observations of Boerste during the examination, though he maintained that his conclusions were based on testing.  (*Id.* at 4330-4331.)

Dr. Sullivan also submitted a subsequent affidavit in which he stated that he relied upon no subjective observations, either his own or Ms. Fisher's, in forming the conclusions in his report. (DN 172-2, at PageID # 4354.)  Rather, he "relied upon the results of the objective tests [he] performed or supervised."  (*Id.*)  His affidavit further clarified Ms. Fisher's role was one of a student under supervision in a clinical placement.  (*Id.* at 4353.)  He stated, "She observed, did a few tests under my direct supervision, double scored some of the tests, and proofread the report I wrote."  (*Id.* at 4355.)  Dr. Sullivan also identified, to the extent possible, the tests Ms. Fisher administered to Boerste.  (*Id*. at 4353.)  But he explained that there is deliberately little to no room for variance in testing administration.  (*Id*. at 4354.)

### B.     The Instant Motion

Boerste requested leave of Court to take the deposition of Ms. Fisher after the close of fact and expert discovery.  (DN 163, at PageID # 4149.)  Boerste asserted Ms. Fisher's identity was disclosed for the first time during Dr. Sullivan's deposition.  (*Id.* at 4147.)  He ultimately admitted his counsel knew on December 17, 2019, "an assistant" would be present during the examination, but argued knowledge of a person's existence is different than knowledge she has discoverable information pertaining to an issue in the case.  (DN 189, at PageID # 6633.)  Further, he argued, it was not until Dr. Sullivan's deposition testimony created a discrepancy in Ms. Fisher's role that the issue of her knowledge arose.  (*Id.* at 6635.)

Boerste cited two reasons that he needed to take Ms. Fisher's deposition.  The first stemmed from Dr. Sullivan's conclusions that he is a liar, is feigning any impairments, and did not put forth sufficient effort on the testing Dr. Sullivan administered.  (DN 163, at PageID # 4149.)  According to Boerste, Dr. Sullivan reached this conclusion by relying, at least in part, on observations during the interview process of the evaluation.  (*Id.*)  Thus, because Ms. Fisher was present during the evaluation, she possesses discoverable information regarding questions, responses, and effort put forth during the evaluation.  (*Id.*)  Boerste's second justification for deposing Ms. Fisher was ambiguity of her role in the evaluation.  (*Id.*)  He claimed that Dr. Sullivan could not remember what role Ms. Fisher played in the evaluation during his testimony, other than that she was an observer, and that this was contradicted by the Supervision Statement that suggested a more active role.  (*Id.*)  Boerste argued that "counsel need[ed] to ask Ms. Fisher what test(s) she might have administered as part of the evaluation . . . [and] to question her on her involvement in the neuropsychological evaluation process to ensure that she is in fact certified to participate in such evaluations."  (*Id.*)

The Defendants deny the need for Ms. Fisher's deposition as Dr. Sullivan did not rely on any subjective observations in reaching his report conclusions.  (DN 172, at PageID # 4186.)  They argued Dr. Sullivan's testimony sufficiently described her role and that the supplemental affidavit they attached to their response clarified any uncertainties.  (*Id.* at 4182.)  The Defendants also emphasized that Boerste's Motion is untimely because all discovery deadlines have passed and Boerste has known Ms. Fisher was present during his examination since December 19, 2019.  (*Id.* at 4188.)  Further, argued Defendants, under Fed. R. Civ. P. 26(b)(4) Ms. Fisher cannot be deposed as she has not been identified as an expert whose opinions may be presented at trial and she is not qualified to give expert opinions.  (*Id.* at 4191.)

6

Boerste denied Dr. Sullivan's affidavit resolved the need for Ms. Fisher's testimony because Dr. Sullivan admitted to being biased in his deposition.  (DN 189, at PageID # 6639.)  Dr. Sullivan did testify that his opinions in this case are biased because of and influenced by an accusation from Boerste's expert that he acted unethically.   (DN 172-1, at PageID # 4330.) According to Boerste, that bias calls into question how the evaluation was performed and what really happened.  (DN 189, at PageID # 6639.)  He also argued that he does not seek Ms. Fisher's expert opinions but rather fact discovery.  (*Id.* at 6637.)

## II.    DISCUSSION

Defendants argued that the Court should consider five factors in determining whether to re-open discovery:

> (1) when the moving party learned of the issue that is the subject of discovery; (2) how the discovery would affect the ruling; (3) the length of the discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to prior discovery requests.

(DN 172, at Page ID # 4188.) (citing *Estep v. City of Somerset*, No. 10-286-ART, 2011 U.S. Dist. LEXIS 95008, at *3 (E.D. Ky. Aug. 24, 2011) (citing *Bentkowski v. Scene Magazine*, 637 F.3d 689, 696 (6th Cir. 2011)).  The Court is not persuaded that these factors apply in this context because the factors are typically applied in the context of a party who argues additional discovery is needed before the Court rules on a motion for summary judgment.  *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1195-97 (6th Cir. 1995).  Boerste's motion makes no such argument.  Instead, the Court finds the resolution of the instant motion rests in overall discovery threshold of relevancy.

Fed. R. Civ. Proc. 26(b) provides, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b).  For discovery purposes, relevant material "will encompass

any matter that may bear upon, or reasonably could lead to other matters that could bear upon, any issue that is or likely may be raised in the case." *Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 380 (W.D. Ky. 2007). "When faced with questions over, or disputes about, what information or documents may be obtained based on their relevancy, it is axiomatic that the trial court is afforded broad discretion to determine the bounds of inquiry." *Janko Enters. v. Long John Silver's, Inc.*, No. 3:12-cv-345-S, 2013 WL 5308802, at *2 (W.D. Ky. Aug. 19, 2013) (citing *Chrysler v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir.1981), *cert. denied*, 454 U.S. 893 (1981)). Although the scope of discovery is broad, it is not unlimited. In examining the scope of discovery the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). On motion or on its own, the Court may limit discovery that is unreasonably cumulative or duplicative; may be obtained from a less burdensome or expensive source; is outside the scope of discovery; or that a party has already had an opportunity to obtain in the action. *Id.* at 26(b)(1)(2)(C).

Boerste seeks the deposition testimony of Ms. Fisher in order to unravel unnecessary questions. Dr. Sullivan has sufficiently described the role she played during the evaluation, what tests she administered, and what certifications she held. Likewise, Dr. Sullivan has explained that no subjective perceptions contributed to the conclusions in his report, not even his own. If Boerste does not believe Dr. Sullivan's testimony, he is entitled to cross-examine Dr. Sullivan about the basis for his opinion at trial, but the Court is not convinced that additional testimony from Ms. Fisher is necessary in order to enable Boerste to do so. The evidence submitted by the Parties establishes that whatever may be the basis of Dr. Sullivan's conclusions, Ms. Fisher did not

8

independently contribute to them.  No information that Ms. Fisher could offer would bear upon any issue, or likely issue, in this case.  Nor could her deposition testimony reasonably lead to other matters that bear upon an issue or likely issue.  Ms. Fisher could not offer any information that was not or could not be offered by Dr. Sullivan and thus deposing her would be unreasonably duplicative.  Further, the testimony that Boerste seems to want to elicit from Ms. Fisher walks the line between lay testimony and expert witness testimony that both Parties appear to agree Ms. Fisher is not qualified to give.  (DN 172, at Page ID # 4190; DN 189, at Page ID # 6637.)  Boerste's reliance on Dr. Sullivan's testimony about his bias does not change this conclusion as it is unclear that any information Ms .Fisher could offer would shed any light on this issue.

The Court must also consider how allowing Ms. Fisher's deposition might affect future educational opportunities.  Were this Court to allow the deposition of a student supervisee in this context, it could have a chilling effect on the availability of those types of educational experiences.  Many professions promote and even require students in the field to observe practitioners as part of their educational training.  Restriction of these opportunities would disadvantage students in their quality of education and professional readiness.

For all these reasons, the Court finds Ms. Fisher's testimony is outside the scope of discovery.

### III.   ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that Bryan Tyler Boerste's

Motion for Leave of Court to Take the Deposition of Allie Fisher (DN 163) is **DENIED**.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:  Counsel of record

October 29, 2020