UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:17-CV-00298-BJB-CHL

BRYAN TYLER BOERSTE,                                              Plaintiff,

v.

ELLIS, LLC, et al.,                                              Defendants.

<u>REPORT AND RECOMMENDATION</u>

Before the Court are seven motions to exclude expert testimony filed by various Parties (DNs 178, 179, 180, 181, 182, 183, 184), the Motion for Leave to File a Surreply (DN 229) of Plaintiff Bryan Tyler Boerste ("Boerste"), and Motion for Leave to file a response out of time (DN 231) filed jointly by Defendant Ellis, LLC ("Ellis LLC"); Defendant Ellis Towing, LLC ("Ellis Towing"); Defendant Kevin Bewley ("Bewley"); Defendants City of Springfield, Kentucky and Springfield Police Department (the "Springfield Defendants"); Defendant Michael Cotton ("Cotton"); Defendant Mattingly Security, Inc. ("Mattingly Security"); and Defendant Joshua Baker ("Baker") (collectively, "Defendants").  All motions related to the admissibility of expert testimony pursuant to Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), have been referred to the undersigned "to conduct a hearing, if necessary, and to submit proposed findings of fact and a recommendation for disposition."  (DN 195.)  The case has also been referred to the undersigned "for hearing and determining all pretrial matters, including non-dispositive motions" pursuant to 28 U.S.C. § 636(b)(1)(A).  (DN 237.)  While the latter referral would permit the undersigned to issue an order resolving the two motions for leave (DNs 229, 231), given the relationship of those motions to the motions on which the undersigned has been tasked with making a report and

recommendation, the undersigned will likewise make a recommendation on the motions for leave.

All motions are either fully-briefed or the time to submit responses and replies has expired. (DNs 198, 199, 204, 205, 210, 214, 216, 217, 218, 223, 233, 235.)  Therefore, these matters are ripe for review.

## I.   FINDINGS OF FACT

This matter arises from an April 16, 2016, incident.[1]  Boerste was visiting friends at St. Catharine College ("St. Catharine"), which at the time was located in Springfield, Kentucky.[2] Defendants allege that while visiting his friends, Boerste used drugs—namely, Xanax, marijuana, and cocaine.[3]  That morning, Baker, an employee of Mattingly Security, which provided campus security at St. Catharine, saw Boerste and his friend attempting to access a door improperly and otherwise acting strangely.[4]  Ultimately, Baker asked Boerste and his friend to leave the building and wait by their vehicle; Baker called the Springfield Police Department because he was concerned about the two men driving and suspicious they were under the influence.[5]

Springfield Police Officer Cotton arrived on scene and administered a breathalyzer test, which Boerste was told he passed.[6]  Cotton told them to leave campus, and they drove away.[7]

---

[1] (DN 1-12, at PageID # 547.)
[2] (Id.; DN 128-1, at PageID # 2603-04; DN 140, at PageID # 3896; DN 173-1, at PageID # 4359; DN 176-1, at PageID # 4741; DN 186-1, at PageID # 5770; DN 187-1, at PageID # 5784; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)
[3] (DN 128-1, at PageID # 2604; DN 174-1, at PageID # 4615; DN 176-1, at PageID # 4741; DN 186-1, at PageID # 5770; DN 187-1, at PageID # 5784.)
[4] (DN 140, at PageID # 3897-98; DN 128-1, at PageID # 2604-05; DN 173-1, at PageID # 4359; DN 174-1, at PageID # 4615; DN 176-1, at PageID # 4741; DN 186-1, at PageID # 5770-71; DN 187-1, at PageID # 5784-85; DN 206, at PageID # 6842.)
[5] (DN 128-1, at PageID # 2604-05; DN 140, at PageID # 3897-98; DN 173-1, at PageID # 4359; DN 174-1, at PageID # 4615-16; DN 176-1, at PageID # 4741; DN 186-1, at PageID # 5770-71; DN 187-1, at PageID # 5784-85; DN 206, at PageID # 6842; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)
[6] (DN 128-1, at PageID # 2605; DN 140, at PageID # 3898; DN 173-1, at PageID # 4359-60; DN 174-1, at PageID # 4616; DN 176-1, at PageID # 4741; DN 187-1, at PageID # 5785; DN 206, at PageID # 6842; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)
[7] (DN 128-1, at PageID # 2605; DN 173-1, at PageID # 4360; DN 174-1, at PageID # 4616; DN 176-1, at PageID # 4741-42; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5785; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)

Baker watched Boerste and his friend drive to a different place on campus, alerted Cotton, and Cotton again told the two to leave.[8]  As Boerste attempted to leave the second time, he ran a stop sign and went straight through a t-intersection, getting his car stuck on the edge of the road.[9]

Baker called a tow truck at the direction of the St. Catharine's Vice President of Student Affairs.[10]  Boerste and his friends wanted to try to push the car back onto the road, but Baker refused.[11]  When Bewley, the tow truck driver from Ellis Towing, LLC and/or Ellis LLC,[12] arrived and began to pull Boerste's car up onto the tow truck, Boerste climbed onto his car's roof.[13] Ultimately, Bewley drove away with Boerste still on the roof of his car.[14]  As Bewley drove away, Boerste either fell from the roof of his car or jumped and struck his head on the guardrail.[15]  Boerste was airlifted to the hospital.[16]

Boerste alleged that neither Baker nor Cotton took any action to prevent Bewley from loading his car onto the rollback tow truck or driving away with him on top.[17]  Boerste claimed

---

[8] (DN 128-1, at PageID # 2605; DN 140, at PageID # 3898; DN 173-1, at PageID # 4360; DN 174-1, at PageID # 4616; DN 176-1, at PageID # 4742; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5785; DN 206, at PageID # 6842; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)

[9] (DN 128-1, at PageID #2605-06; DN 140, at PageID # 3899; DN 173-1, at PageID # 4360; DN 174-1, at PageID # 4616; DN 176-1, at PageID # 4742; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5785; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)

[10] (DN 128-1, at PageID # 2606; DN 140, at PageID # 3899; DN 173-1, at PageID # 4360; DN 174-1, at PageID # 4617; DN 176-1, at PageID # 4742-43; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5785; DN 206, at PageID # 6842; DN 207, at PageID # 6917; DN 208, at PageID # 6954.)

[11] (DN 128-1, at PageID # 2606; DN 140, at PageID # 3899-900; DN 174-1, at PageID # 4617; DN 206, at PageID # 6843.)

[12] While the issue is not relevant to disposition of the instant motions, Boerste contends that Ellis LLC and Ellis Towing are either a joint venture or that Ellis LLC operated its business through Ellis Towing.  (DN 121.)

[13] (DN 128-1, at PageID # 2606-07; DN 140, at PageID # 3900; DN 173-1, at PageID # 4360-61; DN 174-1, at PageID # 4617; DN 176-1, at PageID # 4743; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5785; DN 197, at PageID # 6670; DN 206, at PageID # 6843; DN 207, at PageID # 6917-18; DN 208, at PageID # 6955.)

[14] (DN 128-1, at PageID # 2607; DN 140, at PageID # 3901; DN 174-1, at PageID # 4617; DN 176-1, at PageID # 4743; DN 186-1, at PageID # 5771; DN 187-1, at PageID # 5786; DN 197, at PageID # 6671-72; DN 200, at PageID # 6795; DN 206, at PageID # 6843-44; DN 207, at PageID # 6918; DN 208, at PageID # 6955.)

[15] (DN 128-1, at PageID # 2607; DN 140, at PageID # 3901; DN 173-1, at PageID # 4359, 4361; DN 174-1, at PageID # 4618; DN 176-1, at PageID # 4744; DN 186-1, at PageID # 5771-72; DN 187-1, at PageID # 5786; DN 206, at PageID # 6844; DN 207, at PageID # 6918; DN 208, at PageID # 6955.)

[16] (DN 174-1, at PageID # 4618; DN 176-1, at PageID # 4744.)

[17] (DN 1-12, at PageID # 548-49.)

that as a result of the accident he incurred medical expenses and will continue to incur future medical expenses for care and rehabilitative services.[18]  He alleged that he incurred lost wages, lost benefits of employment, and permanent impairment of his ability to labor and earn money and perform household services as a result of the accident.[19]  He brought negligence, gross negligence, and IIED claims against all Defendants; claims for violations of 42 U.S.C. § 1983 against the Springfield Defendants, Cotton, Bewley, and Ellis Towing; claims for failure to train and supervise against the Springfield Defendants, Mattingly Security, and Ellis Towing; and assault and battery claims against Ellis Towing, Ellis LLC, and Bewley.[20]

## II.   CONCLUSIONS OF LAW

### A.   Legal Standard for Admissibility of Expert Testimony

Fed. R. Evid. 702, which governs the admission of expert testimony, provides,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b)   the testimony is based on sufficient facts or data;

> (c)   the testimony is the product of reliable principles and methods; and

> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  These prerequisites apply to not only to "scientific" testimony but to all expert testimony within the scope of Fed. R. Evid. 702.  *Kumho Tire*, 526 U.S. at 141, 147 (quoting Fed. R. Evid. 702).

Under this Rule, the trial judge acts as a gatekeeper to ensure that expert testimony is both

---

[18] (*Id.*)
[19] (*Id.*)
[20] (*Id.* at 551-56; DN 241, at PageID # 7735.)

relevant and reliable. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (citing *Kumho Tire*, 526 U.S. at 147 and *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997)); *Daubert*, 509 U.S. at 589. Although there is no "definitive checklist or test" to strike this balance, relevant factors include: (1) whether a theory or technique "can be (and has been) tested"; (2) whether a "theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the theory or technique is generally accepted. *Daubert*, 509 U.S. at 593-94. These factors are not exhaustive and the inquiry is "a flexible one," *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) (citations omitted), for district courts must be mindful that "the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.' " *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). Further, in assessing reliability, the Court must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

The proponent of expert testimony "must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). Additionally, where the Parties submit sufficient information for the Court to adjudicate the motion, the Court is not required to hold a hearing. *Nelson*, 243 F.3d at 249; *Kumho*, 526 U.S. at 152.

**B.    Evidentiary Hearing**

After reviewing the Parties' briefs, the undersigned finds that there is an adequate basis in the record from which to determine the qualifications of the experts at issue and the relevance and reliability of their proposed testimony. Though Fed. R. Civ. P. 26(a)(2) requires only disclosure of a party's expert witnesses subject to the conditions therein and Fed. R. Civ. P. 5(d)(1)(A) directs that expert disclosures made pursuant to Fed. R. Civ. P. 26(a)(2) not be filed in the record "until

they are used in the proceeding," the Parties generally filed the relevant disclosures in the record separately and in advance of filing their *Daubert* motions.[21] The Parties also either separately filed or attached to their motion(s) the entirety or relevant excerpts of the depositions of the experts at issue.[22] Thus, the undersigned finds no evidentiary hearing is necessary to resolve the instant *Daubert* motions. *See Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703 (E.D. Mich. 2003) (citing *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999)) (finding that no evidentiary hearing was necessary to resolve *Daubert* motions where "the parties ha[d] submitted sufficient information to permit the Court to adjudicate the motions").

### C. Motion to Exclude Testimony of Charles W. Drago (DN 178)

The Springfield Defendants, Cotton, Mattingly Security, and Baker filed a motion to exclude the testimony of Charles W. Drago ("Drago"), Boerste's expert on "proper police policies, practices in arrest techniques[,] and security."[23] (DN 112, at PageID # 2004; DN 178.) The Parties took Drago's deposition on December 18, 2019. (DN 225.)

Drago has had a thirty-year career in law enforcement with experience in the roles of police chief, assistant police chief, field training officer, detective, sergeant, captain, and major, as well as experience as a "frontline law enforcement officer who was directly or indirectly involved in thousands of arrests." (DN 112-1, at PageID # 2011-12.) He has an Associates Degree in Criminal Justice from the State University of New York in Farmingdale, New York and a Bachelor of Arts

---

[21] *See* DNs 112 (Drago narrative disclosure), 112-1 (Drago report), 112-2 (Drago CV); DNs 111 (Stidham narrative disclosure), 111-1 (Stidham 11/23/2019 report), 111-2 (Stidham CV), 157 (Stidham supplemental narrative disclosure), 157-1 (Stidham 4/7/2020 report), 203 (Stidham second supplemental narrative disclosure); DNs 122 (Dr. Smock disclosure), 122-1 (Dr. Smock report), 180-2 (Dr. Smock CV); DNs 109 (Gibson narrative disclosure), 181-1 (11/20/2018 report), 109-1 (Gibson 11/26/2019 report), 109-2 (Gibson CV); DNs 134 (Dr. Sullivan and Dr. Ireland narrative disclosure), 134-1 (Dr. Ireland report), 134-2 (Dr. Ireland CV), 134-4 (Dr. Sullivan Report), 134-5 (Dr. Sullivan CV).

[22] *See* DN 225 (Drago deposition); DN 226 (Stidham deposition); DN 224 (Dr. Smock deposition); DN 181-2 (Gibson deposition); DN 182-2 (Dr. Ireland deposition excerpts); DN 172-2 (Dr. Sullivan deposition).

[23] For purposes of Section II(C), the undersigned will refer generally to the Springfield Defendants, Cotton, Mattingly Security, and Baker as the "movants."

Degree in Administration of Justice from St. Thomas University in Miami, Florida; completed a
400-hour Command Officers Development Course at the Southern Police Institute at the
University of Louisville in Louisville Kentucky; and has a Florida Police Officer Certification
from the Broward County Institute of Criminal Justice.  (DN 112-2, at PageID # 2035.)  He also
served as a law enforcement policy advisor to the Governor of Florida.  (DN 205, at PageID #
6824; DN 112-2, at PageID # 2033.)  His resume and report establish that he possesses "significant
experience with the investigation of police officer use of force[ ] as an officer, immediate
supervisor, and senior administrator."  (DN 112-1, at PageID # 2012; DN 112-2.)  He also states
that he has "trained thousands of police officers in the use of force, criminal investigations, search
warrant procedures, narcotics investigations, and patrol procedures."  (DN 112-1, at PageID #
2012.)

    In his report, Drago opined generally that "Cotton failed to follow accepted police practices
for controlling the situation and protecting the individuals associated with the event" and that
"Baker failed to provide adequate security when he failed to take effective action to protect
students and visitors [at] St[.] Catharine . . . ."  (*Id.* at 2013, 2017.)  Drago concluded that Cotton
"should have taken further steps to try to determine Boerste's level of intoxication"; consistent
with his police training, should have prevented Boerste from driving his vehicle while impaired;
"had a clear responsibility to take control of the situation and direct the tow truck driver to stop
the towing process until Boerste came down from his vehicle"; and "Cotton's failure to take action
and control this situation was in direct violation of Springfield Police Department policy which
requires police officers to take action in any criminal or emergency situation."  (*Id.* at 2014-16.)
Drago identified a number of other "lawful police actions" Cotton could have taken to control the
situation.  (*Id.* at 2014-15.)  Drago also concluded that Baker should have stopped the towing

7

procedure once Boerste climbed on top of the car and that "Baker's actions were inconsistent with his duty to protect the students and visitors at Saint Catharine . . . ." (*Id.* at 2015, 2018.)

Movants argued that Drago should be prohibited from testifying at trial because he is not qualified to offer opinions as to police standards and practices in Kentucky specifically or as to the private security industry generally. (DN 178, at PageID # 4815-18.) In the alternative, they also argued that certain specific opinions offered by Drago should be excluded. (*Id.* at 4818-26.) Boerste argued in response that Drago was qualified to offer the opinions contained in his report and given at his deposition. (DN 205.) Boerste also maintained that the particular opinions movants challenged were nonetheless admissible. (*Id.*) The undersigned will consider the admissibility of Drago's opinions as to Cotton and Baker separately below.

### 1.    Drago's Opinions as to Cotton

Movants argued that Drago is not qualified to provide testimony as to Cotton's actions. (DN 178, at PageID # 4815-17.) When considering an expert's qualifications, the court does not consider an expert's qualifications "in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting *Berry*, 25 F.3d at 1351). As another Court in this District has explained, under the Rules, "the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 365 (W.D. Ky. 2020) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981)).

Here, as to Cotton's qualifications, Boerste intends to elicit testimony from Drago regarding "whether Officer Cotton's actions were 'negligent' or 'objectively reasonable' under the

circumstances, such that he breached his duty owed to [Boerste]."  (DN 205, at PageID # 6827.)

Boerste asserted in his response that "Drago's opinion is limited to a discrete police-practice issue,

specifically whether a law enforcement officer failed to take actions . . . to control a potentially

dangerous situation."  (*Id.*)  Movants contended that to offer this opinion and his opinion that

Cotton "failed to follow accepted police practices," Drago must be familiar with Kentucky law

and police standards.  (DN 178, at PageID # 4815-17.)  However, the only authority to which they

cited to support this need for Kentucky-specific experience and knowledge is *Whren v. United

States*, 517 U.S. 806, 815 (1996).  *Whren* is not a case about the admissibility of expert testimony;

it is about whether a motorist's temporary detention violates the Fourth Amendment.  *Id.* at 808.

In rejecting the test proposed by the *Whren* petitioners for considering the reasonableness of a

traffic stop, the Supreme Court observed that "police enforcement practices, even if they could be

practicably assessed by a judge, vary from place to place and from time to time."  *Id.* at 815.  The

Supreme Court thus rejected the petitioners' proposal that a traffic stop should be considered

reasonable where "a reasonable officer in the same circumstances would [ ] have made the stop

for the reasons given."  *Id.* at 814.  When considered in context, this statement falls far short of

supporting movants' argument as to Drago's qualifications.  Instead, Drago's familiarity or lack

thereof with particular Kentucky standards goes to the weight to be afforded to Drago's testimony,

not his qualifications.  *See Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir.1984)

("Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will

assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory

definitions or standards is not grounds for disqualification. Such lack of familiarity affects the

witness'[s] credibility, not his qualifications to testify.").

Movants also cited to *Berry v. City of Detroit*, in support of their argument that Drago isn't

qualified to opine about Cotton's actions.  In *Berry*, the Sixth Circuit held that a "sociologist cum sheriff," who plaintiff held out as an expert in the field of "police policies and practices," was not qualified to offer an opinion as to whether "the alleged failure of the Detroit Police Department to discipline properly officers other than [the defendant] was the proximate cause of [the defendant officer] shooting [the plaintiff]."  *Berry*, 25 F.3d at 1348-49.  The expert at issue had degrees in sociology and education and had taken some unknown number of criminal justice classes.  *Id*. at 1348.  He had served for a time as a deputy sheriff but had received no formal training for the position.  *Id.*  He also served as an elected sheriff for four years and after that worked for the Justice Department developing training for sheriffs despite an apparent lack of qualifications for that position.  *Id.*  The Sixth Circuit concluded that the expert witness's credentials "*as set forth in the record* d[id] not qualify him to know any more about what effect claimed disciplinary shortcomings would have on the future conduct of 5,000 different police officers than [ ] any member of the jury."  *Id.* at 1352 (emphasis in original).  The Sixth Circuit also stated that "there is no such 'field' as 'police policies and practices' " because that field was too broad.  *Id.*  The Sixth Circuit later qualified its statement in *Berry* noting that it did not intend to "hold that an individual cannot ever testify as an expert about some aspect of police affairs," rather it was meant to signify that "unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004).  The Sixth Circuit determined in *Champion* that an expert was qualified "based upon his particularized knowledge" to testify about the use of excessive force.  *Id.  See also id.* at 909 (holding the district court did not abuse its discretion in admitting the testimony of an expert because he "had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized knowledge.");

*Campbell v. Cty. of Springboro*, 788 F. Supp. 2d 637, 662-63 (S.D. Ohio 2011) (finding expert qualified to testify because he possessed specialized knowledge regarding training and use of police dogs).

Drago's experience is vastly different than that of the expert in *Berry*. Drago has significant specialized knowledge, training, and experience in various law enforcement roles and has both been trained and trained others in discrete areas such as use of force, patrol procedures, community policing, and criminal investigation. (DN 112-2, at PageID # 2032.) Given these distinctions from the authority relied on by movants, the undersigned finds Drago qualified to testify about Cotton's actions.

Despite his qualifications, the undersigned nonetheless has significant concerns regarding the relevance and reliability of Drago's opinions.[24] The fundamental objective when considering the admissibility of expert testimony is to " 'ensure the reliability and relevancy' of that testimony." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 152). "Expert testimony is relevant under Rule 702 and *Daubert* if it will assist the trier of fact to better understand the evidence or to decide a material fact in issue." *United States v. Gallion*, 257 F.R.D. 141, 150 (E.D. Ky. 2009). "Helpful opinions do not 'merely tell the jury what result to reach' . . . [or] 'address[ ] matters that [are] equally within the competence of the jurors to understand and decide.' " *Youngberg v. McKeough*, 534 F. App'x 471, 479 (6th Cir. 2013) (quoting *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1272 (6th Cir.1988)). *See Berry*, 25 F.3d at 1350 (quoting Fed. R. Evid. 702) ("If everyone knows this, then we do not need an

---

[24] While movants did not challenge the admissibility of Drago's opinions as a whole other than on the issue of his qualifications, Fed. R. Evid. 702 and *Daubert* require the Court to "determine whether an expert's testimony is both relevant and reliable when ruling on its admission." *Clay*, 215 F.3d at 667. Thus, it is proper for a court to raise these issues *sua sponte* consistent with its gatekeeping role. The undersigned finds that it is unnecessary under the circumstances to provide notice to Boerste in advance of issuing the instant recommendation of his intent to do so. Since the undersigned is issuing a report and recommendation on the instant motion, Boerste will have an opportunity to file objections contesting the undersigned's findings. Fed. R. Civ. P. 72(a).

expert because the testimony will not "assist the trier of fact to understand the evidence or to determine a fact in issue."). In particular, the Sixth Circuit has explained that "[i]n cases involving law-enforcement experts, . . . the district court, in performing its gatekeeping role, must assess whether, 'without expert testimony, the average juror is unlikely to understand' the material about which the expert proposes to testify." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998)). The undersigned finds that a lay person without experience in policing could largely listen to the testimony from the other fact witnesses and make his or her own conclusions as to the reasonableness and appropriateness of Cotton's actions without Drago's expert opinion.

The one area of Drago's opinion that seems arguably different is his attempts to testify regarding whether Cotton's conduct was consistent with Springfield Police Department Policy. Other courts have found that police officers may offer "expert testimony regarding recognized police policies and procedure . . . provided that the experts do not express legal conclusions based on their interpretation of the application of those policies in a particular case." *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 690 (E.D. Mich. 2011); *see also Gough v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-CV-849-DJH-CHL, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016) (finding that the police expert "may, however, testify regarding use-of-force policies and procedures and whether [the officer]'s actions were consistent with those standards."). Here, Drago often fails to cite to any such recognized police policies and procedures. Instead, his opinion is largely couched in terms of general statements about police practices but he cites little authority or specific practices to support his opinions. (DN 112-1.) The only specific authorities on which Drago relies are two general Springfield Police Department Policies, one requiring officers to "take

12

action in any criminal or emergency situation coming to their attention" and one requiring police officers dealing with persons of diminished capacity to "control the encounter and determine the best course of action for the subject person." (*Id.* at 2016.) It is unclear how these two, very general policies support all of Drago's opinions. However, based on the authorities cited above, the undersigned finds that Drago's opinions are reliable only to the extent he seeks to testify regarding the Springfield Police Department Policies specified in his opinion and Cotton's purported noncompliance with the same. A jury would not be familiar with those policies and, thus, expert testimony regarding the same would be helpful to them in making a decision.

Other than his citation to Springfield Police Department Policies, Drago's opinion is conclusory and fails to identify the source of the standard by which he is judging Cotton's actions. For example, in his report, Drago states the following opinions:

- Officer Cotton failed to follow accepted police practices for controlling the situation and protecting the individuals associated with the event. (*Id.* at 2013.)
- Officer Cotton had a duty to protect the public . . . . (*Id.* at 2014.)
- Police training dictates that Officer Cotton take some action to prevent Boerste from driving his vehicle. (*Id.*)
- Officer Cotton had a clear responsibility to take control of the situation and direct the tow truck driver to stop the towing process until Boerste came down from his vehicle. (*Id.* at 2015).
- Officer Cotton had a duty to control the situation and prevent anyone from placing anyone else in harm's way. (*Id.*)

It is the details of "accepted police practices" and "police training" that would be helpful to the jury in supplying them with standards with which they are unlikely to be unfamiliar and opinion testimony about whether particular conduct comports with those standards. Drago's conclusory opinions do not fit the mold.[25] *See Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) ("An

---

[25] The deficiencies in Drago's opinion are even more pronounced when one compares it to the opinions disclosed by other experts in this case. For example, Michael Bosse, Cotton's expert, frequently defines the particular training or experience to which he is citing. (DN 132-1, at PageID # 3690 ("[P]olice officers are trained that the owner of the property has a right to have the vehicle removed from their property and that this matter should be treated as a civil issue between the owner of the vehicle, the property owner and the tow service."). Likewise, the Springfield

expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury."); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("We agree that such an idea is based on common sense.  This means, however, that the district court was well within bounds to conclude that expert testimony on [this subject] . . . was inadmissible.").

Accordingly, while the undersigned acknowledges that "rejection of expert testimony is the exception rather than the rule," *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment), and that typically, relevance is a low bar, *United States v. LaVictor*, 848 F.3d 428 (6th Cir. 2017), the undersigned nonetheless recommends that movants' motion to exclude (DN 178) be granted in part and denied in part and that Drago's testimony regarding Cotton be excluded except to the extent Drago seeks to testify regarding Cotton's alleged non-compliance with the Springfield Police Department Policies specified in his opinion.

### 2.    Drago's Opinions to Baker

Movants claimed that Drago was not qualified to offer an opinion about Baker's actions given Drago's lack of experience and training as a private security guard.  (DN 178, at PageID # 4817-18.)  Fed. R. Evid. 702 requires that an expert be qualified "by knowledge, skill, experience, training or education"; here, Drago possesses none of those qualities as it relates to providing private security.  Fed. R. Evid. 702.  Drago's CV neither contains any work experience in private security nor lists any training specifically related to the same.  Though Boerste argued in his response that Drago testified he has performed similar job functions to those of Baker on the day of the incident, testimony that in his role as a police officer Drago responded to calls for

---

Defendants expert, Dr. William Gaut, cites to numerous standards in forming his opinions.  (DN 133-1.)

trespassing, calls related to intoxicated college students, and calls on a college campus do not equate to private security experience sufficient to opine about Baker's actions and responsibilities during the incident in question.  (DN 173-3, at PageID # 4433; DN 205, at PageID # 6830; DN 225, at PageID # 7353.)

Boerste argued that courts have allowed former police officers to render testimony about the conduct of security guards, but his cited authority is distinguishable from the instant case.  The expert at issue in *Lincoln Prop. Co. v. DeShazo*, 4 S.W.3d 55, 59 (Tex. App. 1999), that the Texas Court of Appeals ruled the trial court had properly allowed to testify had experience as a police officer, experience as a security officer for a department store and hospital, and had been the head of security for a mall.  The expert had also worked for the DEA "analyzing commercial properties to assess risks and threats associated with enforcement of federal laws against drug-related crimes that might be committed on those properties."  *Id.*  Unlike the *Lincoln* expert, Drago has no such security experience.  Other courts that have permitted law enforcement officers to testify on security matters have generally found those officers to have at least some experience in the security industry.  For example, the United States District Court for the Western District of Tennessee held that a former secret service agent with 30 years experience who also had been president of a security consulting and investigative firm that provided services such "as executive protection program design, security survey of facilities and operations, technical security audio countermeasures and investigations" was qualified to opine about shopping mall security.  *Starnes v. Sears Roebuck & Co.*, No. 01-2804 B AN, 2005 WL 3434637, at *2 (W.D. Tenn. Dec. 14, 2005).  The United States District Court for the Eastern District of Pennsylvania held that a former police officer who had trained with the FBI; served as the director of public safety for a municipality where he was responsible for "planning and supervising the enforcement of crime

prevention, detection, and investigation programs"; ran a security firm that conducted business, legal, and corporate investigations; and consulted on premises security for a university and "personnel security matters for Major League Baseball" was qualified to offer opinions in a wrongful death action surrounding a robbery in a club parking lot. *Bethea v. Bristol Lodge Corp.*, No. CIV.A. 01-612, 2003 WL 21146146 (E.D. Pa. May 19, 2003).  Because Drago has no similar experience on which to base his opinions, the undersigned finds he is not qualified to testify as to Baker's actions.  The undersigned recommends movants' motion to exclude (DN 178) be granted as to any testimony by Drago about Baker.

### D.      Motions to Exclude Testimony of Joseph Stidham (DNs 179, 183)

The Springfield Defendants, Cotton, Mattingly Security, and Baker filed a motion to exclude the testimony of Boerste's expert Joseph Stidham ("Stidham").  (DN 179.)  Ellis Towing and Bewley filed a separate motion.  (DN 183.)  Boerste disclosed Stidham as an accident reconstructionist and stated that Stidham was "expected to testify on the topics of the reconstruction of the events leading to and occurring during the incident . . . , as well as the cause(s) and contributing factors of the incident."  (DN 111, at PageID # 1918-19.)  Stidham is a former Kentucky State Trooper who was trained as an accident reconstructionist and worked over 400 accidents during his police career.  (DN 111-2, at PageID # 1974.)  Since 1998, he has operated Stidham Reconstruction & Investigation ("SRI") and reconstructed over 1,500 collisions for civil and criminal defendants, civil plaintiffs, and the Commonwealth of Kentucky.  (*Id.* at 1975.)  He graduated from the Kentucky State Police Academy in 1990 where he received training in numerous areas including traffic law; patrol duties, methods, attitudes and preparation; introduction to accident investigation; vehicle collision analysis; accident investigation techniques; skidmark analysis; approach to danger; accident investigation–field projects; accident

16

investigation–exemplar case study; accident scene scale drawing; crime scene reconstruction; major case investigation; and crime scene and accident scene photography.  (*Id.* at 1981-83.)  He has completed numerous trainings related to accident investigation and reconstruction, including ones related to human factors in traffic crash reconstruction, applied physics for traffic collisions, and energy methods and damage analysis.  (*Id.* at 1975-81.)  He is a certified traffic crash reconstructionist and a member of numerous organizations related to accident reconstruction.  (*Id.* at 2000, 2002.)

Stidham provided a report dated November 23, 2019, which Boerste served with his expert disclosures.  (DNs 111, 111-1.)  In his report, Stidham offered numerous conclusions related to the mechanics of the incident and the actions and duties of individuals involved.  (DN 111-1.)  To prepare his report, Stidham reviewed numerous materials including the Kentucky Uniform Police Traffic Collision Report, Kentucky State Police Crime Supplement, Springfield Police Department Incident Report, Ellis Towing GPS data, Baker's reports, St. Catharine College Video Surveillance, pleadings and discovery responses in this matter, depositions of various individuals, witness statements of various individuals, Cotton's body camera footage, reports and vehicle specifications for the involved vehicles, and photos of the scene, among other sources.  (*Id.* at 1926-28.)  He also relied on a scene inspection performed by his SRI colleagues.  (*Id.* at 1928, 1930.)  The Parties took Stidham's deposition on January 14, 2020.  (DN 226.)  After the deposition, on April 7, 2020, Boerste supplemented Stidham's report to correct errors discovered during his deposition, clarify certain information that Stidham had not reviewed prior to his deposition, and retract one opinion listed in his report.  (DNs 157, 157-1.)

Cotton, the Springfield Defendants, Baker, and Mattingly Security argued that Stidham's opinions regarding the actions of and standards of care applicable to Baker and Cotton should be

excluded because Stidham was not qualified to offer opinions on those topics.  (DN 179, at PageID # 4863-66.)   In the alternative, if the Court found he was qualified, they made a number of arguments that individual opinions offered by Stidham should not be permitted for various reasons. (*Id.* at 4866-71.)   In their motion, Bewley and Ellis Towing similarly argued that Stidham was not qualified to offer an opinion as to the standard of care applicable to them.  (DN 183, at PageID # 5459-60.)  They too challenged certain opinions in Stidham's report—such as his opinion terming Bewley's conduct "reckless and dangerous" and regarding whether Bewley could have prevented the incident by not loading the vehicle on the tow truck—arguing that those opinions were not relevant and helpful to the trier of fact as required by Fed. R. Evid. 702 and *Daubert.*  (*Id.* at 5460.) Additionally, they argued that Stidham's testimony will improperly instruct the jury as to the law. (*Id.*)

On August 28, 2020, the same date he filed his response to the motions to exclude Stidham, Boerste served a modification to Stidham's report withdrawing the opinions and conclusions identified on pages 46-48 of the report.  (DN 203, at PageID # 6814.)  Those opinions and conclusions overlap with the opinions and conclusions challenged by Cotton, the Springfield Defendants, Baker, Mattingly Security, Bewley, and Ellis Towing in their motions.  (DNs 179, 183.)  Boerste stated in his supplemental disclosure that he still intended to

> elicit at trial all of Mr. Stidham's opinions, supporting facts and analysis regarding those opinions in the Report and the Corrected Report regarding his reconstruction of the incident, including, but not limited to, his opinions as to how far Tyler fell from the top of his vehicle, his opinions as to how far Bewley drove the tow truck with Tyler sitting on top of his vehicle, and his opinions as to whether Bewley could have seen Tyler sitting on top of his car from the passenger side mirror of the tow truck.

(DN 203, at PageID # 6814.)  In his response to the motions to exclude (DNs 179, 183), Boerste confirmed  that he will only seek to elicit testimony from Stidham at trial related to reconstruction

such as that Boerste's "feet would have been visible to Kevin Bewley out of his lower convex mirror as he drove away," that "Cotton trailed [ ] Bewley as he exited St. Catharine's campus," and that "Bewley drove 812 feet before [Boerste] fell off the moving tow truck from a height of 8.18-9 feet." (DN 204, at PageID # 6817.)  Boerste emphasized that no one challenged Stidham's qualifications with regard to accident reconstruction and argued that those opinions are reliable and appropriate under Fed. R. Evid. 702 and *Daubert*.  (*Id.* at 6816-17, 6819-21.)

In their reply, Cotton, the Springfield Defendants, Baker, and Mattingly Security argued that given Boerste's concessions and amended disclosure, their motion should be granted.  (DN 216, at PageID # 7095.)  Given Boerste's amended expert disclosure and stated intended use of Stidham's testimony, the undersigned finds that the motions to exclude Stidham on this point (DNs 179, 183) are moot.  Boerste no longer intends to elicit the testimony to which movants object; accordingly, there is no relief to be granted.

As to Stidham's opinions regarding reconstruction, the undersigned finds him qualified to offer those opinions given his extensive experience and training.  However, Cotton, the Springfield Defendants, Baker, and Mattingly Security argued that even the more limited version of Stidham's testimony that Boerste now seeks to use contains impermissible testimony regarding the credibility of other witnesses.  (DN 216, at PageID # 7096.)  They are correct that generally, experts cannot testify about the credibility of other witnesses.  *Greenwell*, 184 F.3d at 496.  However, *Greenwell v. Boatwright* illustrates well the line between permissible and impermissible testimony as it relates to reconstruction of an accident and credibility issues.  The Sixth Circuit found in *Greenwell* that the district court committed harmless error in allowing an "expert's response commenting on the credibility of eyewitness testimony" into evidence.  *Id.*  The expert was asked the following question and gave the following answer:

Q:     Let me ask you to assume that one person who was a witness to this accident has testified that the semi tractor being operated by Mr. Boatwright spun in a counter clockwise direction. Based upon the analysis that you made of the damage to the vehicles and their location, do you have an opinion as to whether or not that is an accurate or inaccurate statement?

A:     In evaluating eye-witness testimony, I will not charge an eyewitness with fabricating testimony. I'll merely say that's the best judgment of what they saw and their interpretation of what they saw within the knowledge that they have and to the extent it's a sincere statement on their part. But I also have to observe that an event which takes place in a few seconds, only a certain type of recollection can exist of any person trying to witness, trying to recall an event that takes place in a short time.

*Id.* at 495. After objection, the witness testified that in his opinion, the truck spun out in a clockwise direction based on the physical facts of the accident. *Id.* at 495-96. The Sixth Circuit held that the testimony regarding the credibility of eyewitness testimony was improper, not that the expert's response regarding how the accident occurred was improper. *Id.* at 496. In the instant case, because Stidham's testimony is to reconstruct the accident as it occurs, it is possible that his testimony regarding how the accident occurred may be inconsistent with the testimony of other eye witnesses. For example, Stidham opined that Boerste's feet would have been visible in Bewley's mirror, but Bewley testified that he did not see Boerste. (DN 111-1, at PageID # 1966; DN 204, at PageID # 6820.) This inconsistency alone is not an improper assessment of credibility, although it does constitute a basis on which a jury might find Bewley not to be credible. Accordingly, to the extent that Stidham seeks to testify that in his expert opinion certain events did or did not occur, the undersigned finds that his testimony is sufficiently reliable under *Daubert* and Fed. R. Evid. 702 and should be admitted as it will be helpful to the jury given the many conflicting eyewitness accounts to be presented at trial. The portions of Stidham's report not already withdrawn by Boerste are generally stated in these permissible terms. In their reply, Cotton, the Springfield Defendants, Baker, and Mattingly Security argued that Boerste intended to elicit testimony from Stidham as to the reason Cotton trailed Bewley as Bewley drove away. (DN

216, at PageID # 7096.)  This is inconsistent with the text of Stidham's report cited by Boerste, which merely states that "[a]fter Mr. Bewley completed his 3-point turn and drove by Officer Cotton, Officer Cotton follow immediately behind Mr. Bewley."  (DN 111-1, at PageID # 1968; DN 204, at PageID # 6820-21, 6821 n.13.)

Accordingly, the undersigned recommends that the motions to exclude (DNs 179, 183) be denied.

### E.    Motion to Exclude Testimony of Dr. William Smock (DN 180)

Cotton, the Springfield Defendants, Baker, and Mattingly Security moved to exclude the opinions of Boerste's non-retained expert Dr. William Smock ("Dr. Smock") regarding police practices, towing operations, or security matters.  (DN 180.)  As phrased in their reply, they seek to exclude any testimony by Dr. Smock "beyond that related to the nature and extent of injuries suffered by" Boerste.  (DN 218, at PageID # 7113.)  They argued that Dr. Smock is neither qualified to opine as to such matters nor is his opinion reliable because he has not reviewed Cotton or Bewley's depositions.  (DN 180, at Page ID # 4964.)  Boerste argued that Dr. Smock is both qualified to testify and based his opinions on sufficient facts and data.  (DN 199.)

Boerste disclosed Dr. Smock as a non-retained expert and lay witness.  (DN 122.)  Dr. Smock is a police surgeon with the Louisville Metro Police Department.  (DN 180-2, at PageID # 5138; DN 224, at PageID # 7181.)  He also holds current positions as the medical director of the Jeffersontown Fire and Emergency Medical Services, Norton Healthcare's Forensic Services Program, and WaterStep; holds teaching positions at the University of Louisville School of Medicine and University of Louisville School of Nursing; serves as the Chair of the Medical Advisory Committee and on the National Advisory Team for the Training Institute on Strangulation Prevention in San Diego, California; serves as the police surgeon for the

Jeffersontown and St. Matthews Police Departments and fire surgeon for the Jeffersontown Fire Protection District; and serves as a forensic consultant to the Kentucky Medical Examiner's Office. (DN 180-2, at PageID # 5136-37.)  He earned his Bachelor of Science Degree from Centre College in Danville, Kentucky and both his medical degree and a masters degree in anatomy from the University of Louisville School of Medicine in Louisville, Kentucky.  (*Id.* at 5138.)  He is a member of numerous professional societies, including a founding member of the American Academy of Emergency Medicine and the Academy of Forensic Nursing.  (*Id.* at 5139.)  He is a textbook editor for four textbooks, three of which are related to forensic and/or emergency medicine, and serves as a contributor to numerous other textbooks.  (*Id.* at 5142, 5156-58.)  He has authored numerous peer reviewed publications.  (*Id.* at 5152-53.)  He has also provided forensic consultations on litigation and claims matters via his business Forensic Medical Services since 2011.  (DN 224, at PageID # 7183.)  He previously served as an investigator for the Jefferson County Coroner's office.  (*Id.* at 7185.)

In his disclosure, Boerste noted that the day after the incident, Dr. Smock conducted a "Clinical Forensic Medicine Consultation" related to Boerste.  (DN 122, at PageID # 2322.)  Dr. Smock visited the incident site and Boerste in the hospital where he conducted a physical examination of Boerste.  (*Id.*)  Boerste's disclosure stated that Dr. Smock's testimony would be consistent with Boerste's "medical records and would include opinions with respect to the causation of Tyler Boerste's injuries and his experience treating patients who have suffered similar injuries."  (*Id.* at 2322-23.)  Though it was not prepared at Boerste's request, Boerste tendered with his disclosures Dr. Smock's report. [26]  (DN 122-1.)  Dr. Smock's report lists the individuals with whom he consulted and the details of his examination of Boerste in the hospital, including his

---

[26] In addition to the actual report, the documents attached to Boerste's disclosure contain numerous medical records. (DN 122-1.)

impressions.  (*Id.* at PageID # 2329-31.)

The Parties took Dr. Smock's deposition on February 24, 2020.  (DN 224.)  In response to questioning from counsel, Dr. Smock stated that he has received two weeks of police officer training on accident investigation, has taken courses at the police academy where he also teaches, and maintains firearms qualifications in Floyd County, Indiana, where he is a reserve officer.  (*Id.* at 7214-15.)  He testified that he teaches courses at the police academy related to "[o]fficer-involved shootings, forensic toxicology, [and] motor vehicle accident reconstruction, related to who's the driver, who's the passenger, strangulation, [and] the forensic evaluation of wounds." (*Id.* at 7215.)  In response to questioning by counsel, Dr. Smock testified that in his opinion it was "inappropriate for an officer to let someone stay on a car and leave" and that "Cotton failed to intervene" in the situation.  (*Id.* at 7223-26, 7232; *id.* at 7245 ("[I]t was inappropriate for the officer to permit the vehicle to move with somebody on top of it.").)  He also testified regarding Bewley that "it would be inappropriate for someone to drive off with somebody sitting on top of a car." (*Id.* at 7245.)  However, he explained that his typical duties in forensic examinations include looking at the injuries and understanding "the forensics, meaning how is that injury created, what forces had to be applied to the body to create that particular injury, [and] are the injuries consistent or inconsistent with a particular statement given by an officer or witness."  (*Id.* at 7186-87.)  As to this case specifically, he stated that while "in some consultations there are questions of fault and liability," it was neither his intent nor his responsibility to look at those things in this case.  (*Id.* at 7262-63.)  He explained that his role "was to document the injuries, what happened, how they happened."  (*Id.* at 7263.)

Based on the undersigned's review of Dr. Smock's report, CV, and deposition, the undersigned concludes that Dr. Smock is not qualified to offer at trial the opinions related to the

appropriateness of Cotton or Bewley's conduct that he stated in his deposition.  There is no evidence that Dr. Smock received any particular training regarding police practices and procedures that relate to this incident or any training related to standards applicable to tow truck drivers.  While he did testify that in LMPD internal affairs investigations, he would opine as to whether an officer's use of force was excessive or not, this case did not involve excessive force nor does it involve a shooting.  (*Id.* at 7248.)  Likewise, there is also no question about the mechanism of Boerste's injury that requires a medical opinion to assist the jury in determining who injured Boerste as opposed to how he was injured.  While Boerste's points are well taken that Dr. Smock has more experience with police practices and procedures than the average physician, Boerste still has not demonstrated by a preponderance of the evidence that Dr. Smock has the particular training or experience to support his opinions regarding fault on the instant facts.  Dr. Smock is, however, eminently qualified to offer his opinions and observations regarding Boerste's injuries.  Accordingly, the undersigned recommends that the motion to exclude (DN 180) be granted and that Dr. Smock's opinions regarding the appropriateness of any actor's conduct or fault of any actor related to this incident be excluded from trial.

### F.   Defendants' Motion to Exclude Testimony of David Gibson (DN 181) and Boerste's Motion for Leave to File Surreply (DN 229)

Defendants moved to preclude Boerste's expert David Gibson ("Gibson") from offering any testimony at trial.[27]  (DN 181.)  Defendants claimed that Gibson's testimony should be

---

[27] After Defendants filed their reply in support of their motion, Boerste filed a Motion for Leave to File Surreply arguing that Defendants inaccurately stated in their reply that Gibson relied on a particular source in forming a portion of his opinion when in truth he did not.  (DN 229.)  He tendered his proposed four-page surreply with his motion.  (DN 229-1.)  Whether to permit a party to file a surreply is a matter left to the trial court's discretion.  *See Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (citing *Eng'g & Mfg. Servs., LLC v. Ashton*, 387 F. App'x 575, 583 (6th Cir. 2010) and *Tanielian v. DaimlerChrysler Corp.*, 108 F. App'x 386, 387 (6th Cir. 2004)).  "Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.' "  *Id.* at 265 (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).  However, surreplies are "highly disfavored, as they usually are a strategic

excluded because "his testimony lacks reliability, is based upon ambiguities and generalities, and is premised on nothing but mere conjecture and speculation." (*Id.* at PageID # 5218.) Gibson is a vocational economist, and Boerste indicated in his expert disclosures that Gibson will testify regarding Boerste's loss of earning capacity. (DN 109.) Gibson holds a Bachelor of Science Degree in Accounting from the University of Illinois in Urbana, Illinois; a Master of Business Administration Degree in Finance from the University of Chicago in Chicago, Illinois; and a Masters of Rehabilitation Counseling from the University of Kentucky in Lexington, Kentucky. (DN 109-2, at PageID # 1840.) He has served as a senior analyst at Vocational Economics, Inc. in Louisville, Kentucky since 1993 and at various times has served as the President and Chief Operating Officer of the company. (*Id.*) In those roles, among other duties, he has "[p]rovide[d] assessments of lost earnings due to death, disability, or loss of employment" and "[d]evelop[ed] statistical studies on the impact of disability on employment earnings." (*Id.*)

Gibson first prepared a report regarding Boerste on November 20, 2018 (the "2018 Report"). (DN 181-1.) To prepare the 2018 Report, Gibson reviewed Boerste's deposition, tax returns from 2013-2016, W2s from 2013-2016, school records from Jefferson County Public Schools, and the first neuropsychological evaluation performed by another of Boerste's expert witnesses, Dr. Richard Edelson ("Dr. Edelson"). (*Id.* at PageID # 5233-34; DN 181-2, at PageID # 5289.) He also interviewed Boerste for approximately an hour via telephone. (DN 181-1, at PageID # 5233-34; DN 181-2, at PageID # 5288-89.) Gibson concluded that the present value of Boerste's loss of earning capacity as a result of the accident underlying this litigation was $307,228

---

effort by the nonmoving party to have the last word on a matter." *Liberty Legal Found. v. Nat'l Democratic Party*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (quoting *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 691 n.4 (S.D. Tex. 2006)). Here, the particular point on which Boerste seeks to file a surreply was not made in Defendants' response, and, thus, the undersigned finds that a surreply is appropriate. The undersigned recommends that the Court grant Boerste's motion for leave and has considered the proposed surreply in forming the instant recommendation.

to $995,801.  (DN 181-1, at PageID # 5232.)  He updated his report on November 26, 2019, (the "2019 Report") and the 2019 Report was served with Boerste's expert disclosures as the written report required by Fed. R. Civ. P. 26(a)(2)(B).  (DNs 109, 109-1.)  To update his report, in addition to the documents he reviewed for his 2018 Report, Gibson considered Dr. Edelson's updated November 21, 2019, evaluation, Boerste's tax returns and W2s from 2018, and a document labeled "paycheck advice" that was dated November 8, 2019.  (DN 109-1, at PageID # 1791.)  He also reinterviewed Boerste for approximately fifteen to thirty minutes via phone and updated his report to "reflect current statistics."  (*Id.*; DN 181-2, at PageID # 5349.)  Based on this new information, Gibson opined that the value of Boerste's loss of earnings capacity was now between $715,601 and $1,449,607 if one based the calculations on Boerste's annualized 2019 earnings and between $1,000,265 and $1,487,204 if the calculations were based on the median age-specific earnings for male workers in Louisville, Kentucky with a high school diploma.  (*Id.* at 1793.)  The Parties took Gibson's deposition on January 16, 2020.  (DN 181-2.)

To assess Boerste's loss of earning capacity, Gibson considered Boerste's pre- and postinjury annual earning capacity and pre- and postinjury worklife expectancy.  (DN 181-1, at PageID # 5234.)  In his 2018 Report, Gibson acknowledged that he did not base his calculations on Boerste's actual earnings because prior to the issuance of his report, Boerste had no full time employment and only limited earnings.  (DN 181-2, at PageID # 5299.)  Instead, Gibson used data from the U.S. Census Bureau's American Community Survey ("ACS") on which to base his opinions.  (*Id.* at 5320-21; DN 181-1, at PageID # 5234.)  His report explains that the ACS is the largest annual survey in the United States and is the "preferred source for examining small geographic areas and finely detailed categories."  (DN 109-1, at PageID # 1798.)  Gibson used ACS statistics regarding age, sex, education level, disability status, and earnings to create tables

that allowed him to calculate Boerste's loss of earning capacity.  (DN 181-1, at PageID # 5274-5279; DN 109-1, at PageID # 1831-38; DN 181-2, at PageID # 5322-5347.)  Defendants do not appear to contest either Gibson's qualifications to issue his opinion or that expert testimony regarding Boerste's loss of earning capacity is relevant in that it will be helpful to the trier of fact. (DN 181.)  Instead, they focus their arguments on the reliability of Gibson's testimony.

In assessing the reliability of expert testimony, the Court looks to the factors outlined in Fed. R. Evid. 702 and *Daubert*.  *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019).  As noted above, the inquiry is flexible and not every factor applies in every case. *Daubert*, 509 U.S. at 593-94; *Kumho*, 526 U.S. at 150; *Pluck*, 640 F.3d at 677.  Additionally, the emphasis when considering whether expert testimony is reliable is the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  The analysis is intended *"*to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  Accordingly, the following analysis reflects the undersigned's review of the pertinent Fed. R. Evid. 702 and *Daubert* factors.

Fed. R. Evid. 702(b) requires that an expert's opinion be based on sufficient facts or data. Despite Defendants' arguments to the contrary (DN 181, at PageID # 5222, 5225), the undersigned finds that Gibson's testimony is based on sufficient facts.  Fed. R. Evid. 702(b).  In forming his opinions, Gibson considered specific information regarding Boerste, including his education level, types of prior employment, total earnings, his level of disability, and his location.  *See Scanlan v. Sunbeam Products, Inc.*, No. 3:12-CV-00009-CRS, 2018 WL 476165, at *5 (W.D. Ky. Jan. 18, 2018) (noting that vocational economist who was formulating opinion as to loss of earning

capacity of two-year old child had utilized sufficient information specific to case such as considering education and work history of child's parents and using statistics specific to locale where child lived).  Defendants argued that Gibson failed to consider Boerste's earnings history, education, and employment records.  (DN 181, at PageID # 5222, 5225.)  However, Gibson explained in his deposition that the details of Boerste's educational abilities were not relevant to his analysis, only that Boerste obtained a high school diploma.  (DN 181-2, at PageID # 5291-94.) He likewise explained that all that was pertinent to his analysis from Boerste's work history was where Boerste had previously been employed and what he was paid.  (*Id.* at 5298-99, 5313.)  While Defendants may have wished for a more exhaustive analysis, in light of how Gibson explained the data on which he based his report, it is unclear how the details Defendants emphasize would have allowed Gibson to be any more specific than he has already been.  Further, to the extent Defendants contend the factual basis for Gibson's opinion is insufficient, "any weakness in the underlying factual basis of an expert's testimony bears on the weight, as opposed to the admissibility, of the evidence."  *Southard v. Belanger*, 966 F. Supp.2d 727, 735 (W.D. Ky. 2013) (citing *In re Scrap Metal*, 527 F.3d at 530).

Defendants also criticize Gibson's 2018 Report as being "wrong" given Boerste's earnings in 2019 were greater than Gibson's projections.  (DN 181, at PageID # 5222-24.)  Defendants stated at various points in their motion that there was "no evidence of earnings loss" and "clearly no evidence provided, based on [Boerste]'s actual experience, to suggest [Boerste] suffered any earnings loss other than in the immediate aftermath of his injury."  (DN 181, at PageID # 5224-25.)  However, those statement of the issue and Defendants' criticism that that 2018 Report was "wrong" generally misunderstand the basis of Gibson's testimony and the category of damages for which Boerste seeks recovery.  Boerste seeks to recover for permanent impairment of his power

to labor and earn money, which is a question of how Boerste's capacity to earn money over the course of his life was affected by the accident.  (DN 1-12, at PageID # 558.)  As the Sixth Circuit explained in *Andler*, where loss of earning capacity is at issue, "damages are awarded for loss of earning *power*, not simply loss of earnings.  The proper focus is thus what the injured plaintiff could have earned over the course of her working life without the injury versus what she will now earn, not what she earned or will earn in any given year."  *Andler v. Clear Channel Broad., Inc*., 670 F.3d 717 (6th Cir. 2012).

Additionally, Gibson provided an explanation as to why his figures increased in his 2019 Report.  Gibson testified at his deposition that because Boerste was doing well in his full-time employment after the accident in 2019, this actually indicates Boerste had suffered a greater vocational loss not a lesser one.  (DN 181-2, at PageID # 5353.)  While Defendants view this position as the sine qua non of the unreliability of Gibson's position, the distinction is logically tied to Gibson's reliance on Dr. Edelson's report.  If Dr. Edelson determined that Boerste was worse off after the accident and Boerste is performing at a certain level now, then, according to Gibson, he could have performed at even higher level if not for the accident.  Hence, Gibson's 2019 Report figures are higher than his 2018 Report ones.  Again, to the extent that Defendants disagree with this premise, their disagreement goes to the weight, not the admissibility of Gibson's testimony.   Further, Defendants' emphasis on the correctness and accuracy of Gibson's conclusions are inapposite of the issue before the Court.  The undersigned need not find that Gibson's conclusions are correct for them to be admissible; the undersigned need only find that Gibson's assessment is reliable.  *See In re Paoli Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness. . . . A judge will often think that an expert has good grounds to hold the opinion that he or she does

even though the judge thinks that the opinion is incorrect. . . . The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

The undersigned also finds that Gibson's opinion is based on sufficient data.  Fed. R. Evid. 702(b).  Defendants present no sufficient challenge to the validity of the ACS data on which Gibson relies.  Defendants attempted to argue in their reply that the U.S. Census Bureau and Bureau of Labor Statistics discourage using the ACS data in the way that Gibson has done and as such, Gibson's methodology is not peer-accepted.  (DN 223.) However, as Boerste notes in his surreply, the portion of the website that they cite is related to Current Population Survey ("CPS") Annual Social and Economic Supplement ("ASEC"), a separate source of data from the ACS.  (DN 229-1.)  Gibson explained in his report that the ASEC's focus is work disability and that the CPS is frequently used to calculate unemployment rates.  (DN 109-1, at PageID # 1798, 1800-01.) Gibson even agrees with Defendants in his report that the ASEC was never intended to "measure the existence or impact of disability."  (*Id.* at 1801.)  As Gibson did not rely on ASEC data to formulate his opinion about Boerste's loss of future earnings capacity, Defendants' argument is without merit.  Additionally, despite their expressed concerns over the speculative nature of Gibson's analysis and use of data, Defendants offer no other more reliable source of data to use in assessing Boerste's loss of earning capacity.

Defendants also argued that distinctions between Gibson's 2018 and 2019 Reports demonstrate that his methodology is flawed.  "Admissibility under Rule 702 does not require perfect methodology. Rather, the expert must 'employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " *Best*, 563 F.3d at 181 (quoting *Kumho,* 526 U.S. at 152).  Defendants note that the minimum projected loss in the 2018 Report more than doubled for the 2019 Report—from $307,228 to $715,601— and the

30

maximum projected loss increased by 45.6%—from $995,801 to $1,487,204. (DN 181, at PageID # 5222-24.) This argument ignores the distinctions between the two reports. While in his 2019 Report, Gibson utilized a base earnings figure in the bottom quartile of the data to accommodate Boerste's lack of full-time work history and previous part-time earning levels, in the 2019 Report, Gibson utilized Boerste's 2019 earnings as one basis for estimating his base earnings and a statistical median based on ACS data that was more in line with Boerste's 2019 level of earnings as another. (DN 181-2, at PageID # 5339-40, 5353.) Gibson also utilized different disability statuses in his 2019 Report based on changes in Dr. Edelson's analysis. (*Id.* at 5356-64.) Because of the way Gibson performed his analysis, these changes in inputs account for the changes in his outputs. Based on the undersigned's review of Gibson's deposition testimony and 2018 and 2019 Reports, Gibson's methodology did not change between reports; he calculated his findings the same way. He simply used different data sets to accommodate what he believed were changed circumstances. As such, when the changes are considered in context, they actually demonstrate a consistency in his methodology that countermands Defendants' arguments. The undersigned finds that these changes do not make Gibson's opinion unreliable and instead are simply topics on which he may be cross-examined.

Defendants argued that Gibson's creation of disability categories in the ACS data to use in his analysis was "arbitrary" and did not account for Boerste's medical condition. (DN 181, at PageID # 5225-26.) Regarding these categories, Gibson explained that the ACS survey asks six disability related questions that correspond to different limitations related to hearing, vision, cognitive abilities, mobility, self-care, and one's ability to go outside the home. (*Id.* at 1800; DN 181-2, at PageID # 5321.) As to cognitive limitations, the ACS asks, "Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating,

remembering, or making decisions?" (DN 109-1, at PageID # 1800.) Gibson testified that while individuals responding to the ACS make their own assessment of their cognitive limitations and their reports are not checked as against any particular diagnosis, the U.S. Census Bureau and the Bureau of Labor Statistics have put the survey questions through test groups and found that people do accurately understand and respond to the questions. (DN 181-2, at PageID # 5327-28, 5397-5400.) Based on the ACS data, Gibson defines different levels of disability related to cognitive impairment including no disability, nonsevere or severe cognitive impairment, and total disability. (*Id.* at 5324.) Gibson testified that answering the cognitive disability question in the affirmative but answering no to all other forms of disability would be representative of a person with a nonsevere cognitive disability. (*Id.* at 5323; DN 109-1, at PageID # 1800.) He explained that he relies on a medical opinion in conjunction with his training as a rehabilitation counsel to determine into which category an individual falls. (DN 181-2, at PageID # 5325, 5416.) Though Defendants take Gibson to task for not consulting with Dr. Edelson or any of Boerste's treating physician's, Gibson's testimony evidences that he based his estimate of which disability category to sort Boerste into for pre- and postinjury analysis on Dr. Edelson's opinions. (*Id.* at 5308-09, 5416.) This is not error as an expert opinion is permitted to "be formulated by the use of facts, data and conclusions of other experts." *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) (citing *Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 102 n.10 (3rd Cir. 1982)). When viewed in light of how Gibson actually formed his opinion, Defendants' arguments about methodology again amount to nothing more than an attack of the factual basis of Gibson's disability categories. As the undersigned noted above, this goes to the weight, not the admissibility of the evidence. *See Southard*, 966 F. Supp.2d at 735 Accordingly, the undersigned finds Defendants have failed to show that Gibson's use of disability categories renders his testimony

unreliable.

Defendants attempted to proffer the report of their own expert, Dr. Thomas Ireland ("Dr. Ireland"), as an attack on the general acceptance of Gibson's methodology.  (DN 223, at PageID # 7163; DN 134-1.)  However, Gibson testified that his methodology is peer reviewed and accepted by the very groups that publish the ACS data on which he relies.  (DN 181-2, at PageID # 5375-78, 5389, 5408-09.)  Faced with this competing testimony, the undersigned finds that these issues too go to the weight, not the admissibility of Gibson's testimony.  As the notes to Fed. R. Evid. 702 explain, the rule "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise."  Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

In sum, the undersigned finds that none of Defendants arguments are a basis on which to exclude Gibson's testimony.  Defendants have not demonstrated that Gibson's testimony—however "shaky" they view it to be—is on par with the type of junk science *Daubert* was meant for courts to ward against; thus, their remedy for any deficiencies they perceive in Gibson's report is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ."  *Daubert*, 509 U.S. at 596.  Accordingly, the undersigned recommends that the motion to exclude (DN 181) be denied.

### G.    Boerste's Motion to Exclude Testimony of Dr. Ireland (DN 182) and Defendants' Motion for Leave (DN 231)

Boerste moved to exclude Defendants' forensic economist, Dr. Ireland, from offering any opinion at trial.  (DN 182.)  Defendants failed to file a timely response to Boerste's motion and subsequently filed a motion seeking leave to file their response out of time.  (DN 231.)  They attached their proposed response to their motion.  (DN 231-1.)  Plaintiff filed a response in opposition to the motion for leave, and Defendants filed a reply.  (DNs 233, 235.)  The undersigned

will first address Defendants' motion for leave.

### 1.    Defendants' Motion for Leave (DN 231)

All initial *Daubert* and dispositive motions were due to be filed on or before June 12, 2020. (DN 148.)  The Court subsequently granted several extensions for the filing of responses and replies such that all responses to the pending *Daubert* and dispositive motions were ultimately due on or before August 28, 2020.  (DN 202.)  Defendants did not file a response to Boerste's motion to exclude Dr. Ireland on or before that date.  Instead, on October 7, 2020, Defendants filed a motion for leave to respond out of time.   (DN 231.)   Defendants indicated that they were coordinating on the joint filing of responses and a miscommunication between defense counsel resulted in a response not being timely filed.  (*Id.* at PageID # 7679-80.)  Defendants argued that Fed. R. Civ. P. 15 supported their request.  (*Id.* at 7680.)  However, Fed. R. Civ. P. 15 only governs amendment of pleadings.  Fed. R. Civ. P. 15.  Defendants' response is not a pleading, Fed. R. Civ. P. 7(a), and their requested relief is not amendment.  Thus, Fed. R. Civ. P. 15 does not apply to their request.

Fed. R. Civ. P. 6(b)(1) provides that the court may for good cause extend the time to do an act if the request is made before the original time to do the act expires.  Fed. R. Civ. P. 6(b)(1). However, if the time to act has expired, the party must file a motion demonstrating that it failed to act because of excusable neglect.   *Id.* at 6(b)(1)(B).   The Sixth Circuit has explained that in evaluating whether a party has shown excusable neglect, the Court must balance five factors: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006) (citing *Pioneer Inv. Servs.*

*Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  As to the first and second factors, the undersigned finds that allowing Defendants to file a response out of time will work no prejudice to Boerste and will not unnecessarily delay these proceedings.  There are still multiple motions before the Court for a ruling, and no trial date has yet been set that will be imperiled by granting leave.  The undersigned agrees with Boerste that the miscommunication described was within the reasonable control of the Defendants and that factors three and four weigh in favor of not granting leave.  As to the fifth factor, the undersigned also agrees with the Parties that there is no evidence of bad faith by the Defendants, which weighs in favor of granting leave.  Balancing these factors, the undersigned finds that Defendants' miscommunication under the circumstances can appropriately be termed excusable neglect.  Defendants realized and took steps to remedy their mistake prior to the Court's ruling on any of the *Daubert* motions and only shortly after the same were fully briefed.  *Cf. Howard v. Nationwide Prop. & Cas. Ins. Co.*, 306 F. App'x 265, 267-68 (6th Cir. 2009) (holding that district court did not abuse discretion in finding inadvertent failure to record response date on calendar to be inexcusable neglect because it had a "significant impact on the judicial proceedings in th[e] case" given approaching trial date and pre-trial mediation).  The undersigned also notes that denying the instant motion would circumvent the well-established preference to resolve claims and issues on the merits.  *See, e.g.*, *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991).  In particular, given that Boerste's motion relates to the application of *Daubert* in which the Court has a strong gatekeeping role regardless of whether any party moves to exclude expert testimony, the undersigned finds that allowing Defendants to respond is helpful to the Court's analysis.

Accordingly, the undersigned recommends that Defendants' Motion for Leave (DN 231) be granted, and the undersigned has considered Defendants' tendered response (DN 231-1) in

addressing Boerste's motion (DN 182).  Since the undersigned only recommends that the motion be granted, the undersigned will proceed to address the merits of Boerste's motion without directing Boerste to file a reply.  Boerste will have the opportunity to raise any arguments he would have raised in his reply brief in any objections he files to the instant recommendation.  As his reply brief should generally have only contained arguments related to those he already made in his motion, the undersigned finds this procedure will not prejudice Boerste.

### 2.    Motion to Exclude Testimony of Dr. Ireland (DN 132)

Boerste argued that Defendants' forensic economist, Dr. Ireland, should not be permitted to testify at trial because he "offers no opinions that will aid the trier of fact in determining if [Boerste] has future loss earnings, and if so, what those losses might be."  (DN 182, at PageID # 5435.)  He argued that while Dr. Ireland's report and testimony might be relevant to Defendants' *Daubert* motion regarding Gibson, it is not relevant to the issues at trial.  (*Id.* at 5439-40.)

Defendants' expert disclosure stated that Dr. Ireland "is expected to testify regarding the earning capacity of Tyler Boerste."  (DN 134, at PageID # 3746.)  Dr. Ireland holds a Bachelor of Arts degree in economics from Miami University, in Ohio and a doctorate in economics from the University of Virginia. (DN 134-2.)  Further review of Dr. Ireland's qualifications are unnecessary as Boerste does not dispute that Dr. Ireland is qualified to offer opinions on forensic accounting. (DN 182, at PageID # 5439.)   Though Boerste argued that Dr. Ireland offered no opinion on Boerste's future earnings loss, Dr Ireland's report does appear to contain numerous opinions related to both Boerste's losses as well as the best method of calculating them.  (DN 134-1.)  For example, Dr. Ireland opines that "Boerste is earning far more than the average for his his [*sic*] sex, age and education and far more than he was earning at the time of his injury on April 26, 2016.  Thus, there is no evidence of earnings loss."  (*Id.* at PageID # 3751.)  Dr. Ireland also heavily

criticizes Gibson's methodology and conclusions in both Gibson's reports.  (*Id.* at 3750-58.)

Defendants argued in their response that "Dr. Ireland's testimony and opinions regarding Dr. Gibson's methodology will surely assist the trier of fact in determining whether they find Dr. Gibson's testimony credible and whether Dr. Gibson has demonstrated that Plaintiff in fact suffered a loss." (DN 231-1, at PageID # 7686.)  While generally, "[e]xperts may not testify about the credibility of other witnesses," *Smith v. Jones*, 721 F. App'x 419, 423 (6th Cir. 2018) (citing *Greenwell*, 184 F.3d at 496), this requirement appears to apply largely to apply to the credibility of fact or other witnesses offering non-technical or non-scientific testimony.  *See H.C. Smith Invs., L.L.C. v. Outboard Marine Corp.*, 181 F. Supp. 2d 746, 751 (W.D. Mich. 2002) (collecting cases).  Given the highly technical nature of Gibson's anticipated testimony and the measure of damages for Boerste's loss of earning capacity claims, the undersigned finds that Dr. Ireland's testimony and competing opinion will assist the jury in assessing damages.  In particular, any dispute between Gibson and Dr. Ireland regarding the best way to assess Boerste's damages is an issue of the credibility of competing expert reports and in such cases, "it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves."  *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (quoting *Cadmus v. Aetna Cas. and Sur. Co.,* No. 95-5721, 1996 WL 652769 (6th Cir. Nov. 7, 1996)).

Accordingly, the undersigned recommends that Boerste's motion to exclude (DN 182) be denied.

### H.    Boerste's Motion to Exclude Certain Opinions of Dr. Thomas Sullivan (DN 184)

Boerste filed a motion to exclude the undisclosed opinions of Dr. Thomas Sullivan ("Dr. Sullivan"), Defendants' expert.  (DN 184.)  Defendants disclosed Dr. Sullivan on February 14, 2020.  (DN 134.)  Dr. Sullivan is a neuropsychologist with experience "assessing and diagnosing

Case 3:17-cv-00298-BJB-CHL   Document 246   Filed 09/29/21   Page 38 of 45 PageID #: 7791

brain illness and injury and identifying cognitive dysfunction" who Defendants' expert disclosure stated would be expected to testifying regarding brain illness, brain injury, and cognitive dysfunction "as they pertain to the injuries suffered by [ ] Boerste at St. Catharine College on April 16, 2016." (*Id.* at PageID # 3747.)  Defendants' expert disclosure also stated that "Dr. Sullivan may testify regarding any opinions expressed by Plaintiff's expert Dr. Edelson during his deposition." (*Id.* at 3748.)  Dr. Sullivan's report included both a summary of the 2016 and 2019 opinions of Dr. Edelson and a "note" in which Dr. Sullivan listed three reasons he disputed Dr. Edelson's conclusion that Boerste's "poor performance on visual memory tests" were to be ascribed to "the left thalamic hemorrhage noted after the injury in question." (DN 134-4, at PageID # 3775-77.)  Dr. Sullivan concluded that "Boerste provided insufficient effort during [Dr. Sullivan's] evaluation" of him, which made it impossible for Dr. Sullivan to determine whether Boerste had "any current degradations in his functioning as a result of the injury in question." (*Id.* at 3783-84.)  His report then stated

> Unfortunately, [Boerste]'s insufficient effort during [Dr. Sullivan's] evaluation calls into question [Boerste's] level of effort during Dr. Edelson's recent evaluation. Although Dr. Edelson did administer some standard effort tests to [Boerste] as part of his recent evaluation, those tests are relatively insensitive, meaning that they are less likely to detect insufficient effort than some other measures.  Another concern is that [Boerste] likely read Dr. Edelson's 2016 report before completing the 2019 evaluation.  It is possible that he has no impairments but chose to underperform on tests that would suggest the same 'impairments' noted in 2016.

(*Id.* at 3784.)

The Parties took Dr. Edelson's deposition on February 18, 2020, only a few days after Dr. Sullivan was disclosed.  (DN 210-2.)  At his deposition, Dr. Edelson critiqued and disagreed with several of Dr. Sullivan's opinions contained within his report.  (*Id.*)  Dr. Edelson disagreed with Dr. Sullivan's conclusions regarding the validity of Boerste's test results, in part citing the opinions of Dr. Kyle Boone ("Dr. Boone").  (*Id.*)  While discussing a portion of Dr. Sullivan's report

regarding Dr. Sullivan's statement that it is unethical to present invalid data, Dr. Edelson criticized Dr. Sullivan, stating, "So because Mr. Boerste showed insufficient evidence at times, it would be unethical for me to present data that might otherwise suggest impairment. And I would say it's unethical to stop testing based on one symptom validity test," a criticism intended for Dr. Sullivan. (*Id.* at PageID # 7042.)

The Parties took Dr. Sullivan's deposition on May 14, 2020.[28] (DN 172-1.) Prior to his deposition, Dr. Sullivan reviewed Dr. Edelson's deposition; rereviewed the tests he administered to Boerste; and reviewed and used a book by Dr. Boone, the same doctor relied upon by Dr. Edelson to critique Dr. Sullivan, and other scientific studies "to rebut Dr. Edelson's criticism about Dr. Sullivan's testing and conclusions about [Boerste]'s effort." (DN 210, at PageID # 6998.) Before his deposition, Defendants and Dr. Sullivan provided Boerste's counsel with excerpts from Dr. Boone's work and notes and e-scores/effort equation calculations made by Dr. Sullivan that "he believe[d] contradicted Dr. Edelson's use of Dr. Boone as a supporting authority." (*Id.*; DN 172-1, at PageID # 4306-07.) Boerste's counsel asserted in his reply that this new information was provided "minutes before Dr. Sullivan's deposition." (DN 214, at PageID # 7056 n.8; DN 172-1, at PageID # 4202.) During his deposition, Dr. Sullivan responded to Dr. Edelson's critiques of his opinion and reliance on Dr. Boone's work as well as offered general critiques of Dr. Edelson's opinion. (DN 172-1, at PageID # 4242-51, 4294-4333.) Dr. Sullivan testified,

> The kind of cool thing for me was in reading Dr. Edelson's deposition, Dr. Edelson cited Dr. Boone as the expert about malingering tests, and indicated that based on Dr. Boone's work, I had done something unethical. So sure enough I pulled Dr. Boone's book off my shelf, and found that no I had not done anything unethical, and in actuality that the statements [in] my report were entirely accurate as described by Dr. Edelson's preferred expert.

---

[28] While the Parties attached pertinent excerpts from Dr. Sullivan's deposition to their motion, response, reply, Dr. Sullivan's entire deposition transcript was previously submitted to the Court as an exhibit to Defendants' response to Boerste's Motion for Leave to Depose Allie Fisher. (DNs 172-1, 184-1, 210-1, 214-1.) Accordingly, the undersigned has considered all relevant and necessary portions of the transcript to resolve the instant dispute.

(*Id.* at 4250.)  Boerste now moves to exclude all new calculations and opinions espoused by Dr. Sullivan and the new authority on which he relies pursuant to Fed. R. Civ. P. 37(c)(1) and *Daubert*. (DN 184.)

Boerste first challenged the timeliness of what he terms to be "new" and previously undisclosed opinions by Dr. Sullivan pursuant to Fed. R. Civ. P. 37(c)(1).  Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Fed. R. Civ. P. 26(a)(2) requires the parties to make certain disclosures regarding their expert witnesses "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  A party must supplement its expert disclosures if necessary.  Fed. R. Civ. P. 26(e).  Fed. R. Civ. P. 26(e)(2) provides that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  Fed. R. Civ. P. 26(a)(2)(D) also provides that absent a court order otherwise, disclosure of evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)" must be disclosed "within 30 days after the other party's disclosure."[29]  Fed. R. Civ. P. 26(a)(2)(D)(ii).  However, the rules do not specify any deadlines with regard to rebuttal opinions formed based on deposition testimony as opposed to a party's expert disclosures.  *Gardner v. Dye*, No. 3:15 C 00669, 2016 WL 9244200, at *6 (M.D. Tenn. July 1, 2016); *Starlink Logistics, Inc. v. ACC, LLC*, No. 1:18-cv-0029, 2020 WL 619848, at *2 (M.D. Tenn. Feb. 10, 2020).

---

[29] Here, because the Court never otherwise set a deadline for disclosure of rebuttal witnesses (DNs 17, 44, 48, 58, 67, 86, 101, 127, 148), the same were due within thirty days after the other party's disclosure as specified in the Fed. R. Civ. P. 26(a)(2)(D)(ii).

Boerste argued that Dr. Sullivan offered "new" testimony that should have been supplemented prior to his deposition. (DN 184, at PageID #5741-42.) The undersigned agrees with Defendants that Dr. Sullivan's effort equation calculations, reliance on Dr. Boone's book, and reliance on the other new scholarly articles was rebuttal testimony in response to Dr. Edelson's deposition testimony. Dr. Edelson did not mention Dr. Boone or make any conclusions about Dr. Sullivan in his initial expert report. (DN 110-1.) Thus, Dr. Sullivan did not have any reason to assess those areas in his initial expert report. (DN 134-4.) Dr. Sullivan did respond to Dr. Edelson's written report in his written report consistent with Defendants' disclosure indicating he would give rebuttal testimony. (*Id.*) After reviewing Dr. Edelson's deposition testimony, Dr. Sullivan formed new rebuttal conclusions in response. Defendants' counsel then subsequently supplemented Dr. Sullivan's opinions both in advance of and after his deposition. While it might have been advisable to disclose the supplemental materials further in advance of Dr. Sullivan's deposition, given the requirements of Fed. R. Civ. P. 26, the undersigned cannot find that Defendants did not comply with their supplemental disclosure requirements. Since the rebuttal testimony was based on Dr. Edelson's deposition testimony, Defendants were only required to supplement their initial expert disclosures within the time limit prescribed by Fed. R. Civ. P. 26(e), not within the thirty day limit in Fed. R. Civ. P. 26(a)(2)(D)(ii). The Parties have not yet been directed to make pretrial disclosures, and no trial date is yet set in this matter. Accordingly, the undersigned finds that Dr. Sullivan's rebuttal testimony did not violate the applicable rules and that Boerste's argument under Fed. R. Civ. P. 37 fails.

Boerste separately argued that Dr. Sullivan's rebuttal opinions should be excluded on the basis of bias. (DN 184, at PageID # 5743-45.) Dr. Sullivan testified as follows in response to questioning by Boerste's counsel:

| Mr. Hasken: | Dr. Sullivan, do you know Dr. Edelson? |
|---|---|
| Dr. Sullivan: | No. I never met him. |
| Mr. Hasken: | Have you ever talked to him on the phone? |
| Dr. Sullivan: | Not that I recall. |
| Mr. Hasken: | But you have worked on cases with him before, right? Maybe on opposite sides, right? |
| Dr. Sullivan: | Sure. Yeah. |
| Mr. Hasken: | So are you -- are you familiar with his work? |
| Dr. Sullivan: | Yeah. |
| Mr. Hasken: | What's your take on Dr. Edelson's work? |
| Dr. Sullivan: | I'd say he's usually pretty good. |
| Mr. Hasken: | So you say usually. Do you mean but not in this case? |
| Dr. Sullivan: | Well, I have to say my opinions in this case are carved by his deposition. I've been working with people full-time since 1993, so I've been working with difficult people full-time for 27 years.  I've been accused of doing something unethical exactly once. So, yeah, that rather sticks in my craw. And, in fact, if a psychologist thinks another psychologist has done something unethical, the ethical thing to do is not to slander that person but to call that person. Psychologists are instructed if another psychologist -- if you think another psychologist has done something unethical, you consult that person unless you think that psychologist has done something, you know, life-threatening. If he thinks I'm, you know, molesting children, he should call the police. But, no, the instruction in the ethical code is not slander somebody in a report. So I have to say I -- I think my opinions in this particular case are biased by that. |

(DN 172-1, at PageID # 4329-30.)  Boerste argued that Dr. Sullivan's "admitted bias [ ] prevents

him from reliably applying the principles of neuropsychology to the facts of the case."  (DN 214,

at PageID # 7054.)  He emphasized that given bias, Dr. Sullivan's testimony is no longer reliable

under Fed. R. Evid. 702.  (*Id.* at 7055.)  The undersigned finds Boerste's argument unavailing.

Bias is generally defined as "the relationship between a party and a witness which might

lead the witness to slant, unconsciously or otherwise, [his or her] testimony in favor of or against

a party." *United States v. Sumlin*, 956 F.3d 879, 890 (6th Cir. 2020) (quoting *United States v. Abel,* 469 U.S. 45, 52 (1984)); *see also United States v. Jackson-Randolph*, 282 F.3d 369, 383 (6th Cir. 2002).  But as the Sixth Circuit has explained, bias comes from many different sources:

> the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only.

*Majestic v. Louisville & N.R. Co.*, 147 F.2d 621, 627 (6th Cir. 1945) (citations omitted) (citing Wigmore on Evidence, 2d Ed., §§ 948-949).  "Bias is always relevant in assessing a witness's credibility."  *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999).  However, as Boerste concedes in his motion, "bias in an expert witness's opinion is usually a credibility issue for the jury, not a basis for the Court to exclude the opinion as unreliable"  *Peters v. DCL Med. Lab'ys LLC*, 305 F. Supp. 3d 799, 812 (S.D. Ohio 2018) (citing *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1332,1332-33 (11th Cir. 2014)).  *See also United States v. Abonce–Barrera,* 257 F.3d 959, 965 (9th Cir. 2001); *DiCarlo v. Keller Ladders, Inc.,* 211 F.3d 465, 468 (8th Cir. 2000).  Boerste has presented no authority to justify departing from that general rule in the instant case.  As Defendants point out in their response, Dr. Sullivan's comments do not lead the Court to conclude that he has any particular bias against Boerste that might otherwise invalidate his opinion.  (DN 210, at PageID # 7004.)  Additionally, despite his use of the word "bias" in his testimony, in the context of his testimony as a whole, the undersigned is doubtful Dr. Sullivan intended to signify the sort of bias cited in the cases above.  Instead, his use of the word bias seems to encompass more of a professional irritation or a disagreement rather than a true bias.  Nonetheless, these are topics for Boerste's cross-examination of Dr. Sullivan, not grounds to exclude his testimony.

Accordingly, the undersigned recommends Boerste's motion to exclude (DN 184) be denied.

III.     RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS**:

(1)     the Motion to Exclude Testimony of Charles W. Drago (DN 178) filed by the Springfield Defendants, Cotton, Mattingly Security, and Baker be **GRANTED IN PART and DENIED IN PART** and Drago's testimony regarding Baker be excluded in its entirety but Drago be permitted to testify regarding Cotton's alleged non-compliance with the Springfield Police Department Policies specified in his opinion;

(2)     the Motion to Exclude Testimony of Joseph Stidham (DN 179) filed by the Springfield Defendants, Cotton, Mattingly Security, and Baker be **DENIED**;

(3)     the Motion to Exclude Testimony of Joseph Stidham (DN 183) filed by Ellis Towing and Bewley be **DENIED**;

(4)     the Motion to Exclude Testimony of Dr. William Smock (DN 180) filed by the Springfield Defendants, Cotton, Mattingly Security, and Baker be **GRANTED** and Dr. Smock's opinions regarding the appropriateness of Cotton and Bewley's conduct be excluded from trial;

(5)     Boerste's Motion for Leave to File a Surreply (DN 229) be **GRANTED** and that the Clerk be directed to detached and separately file Boerste's proposed surreply (DN 229-1);

(6)     Defendants' Motion to Exclude Testimony of David Gibson (DN 181) be **DENIED**;

(7)     Defendants' Motion for Leave to file a response out of time (DN 231) be **GRANTED** and that the Clerk be directed to detach and separately file Defendants' proposed response (DN 231-1);

(8)     Boerste's Motion to Exclude Testimony of Dr. Thomas Ireland (DN 182) be **DENIED**; and

(9)     Boerste's Motion to Exclude Certain Opinions of Dr. Sullivan (DN 184) be

**DENIED**.

Colin H Lindsay, Magistrate Judge

United States District Court

cc:  Counsel of record     September 28, 2021

## Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.   A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).