## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

BRYAN TYLER BOERSTE                                              PLAINTIFF

v.                                                    No. 3:17-cv-298-BJB

ELLIS TOWING, LLC, ET AL.                                       DEFENDANTS

* * * * *

### OPINION & ORDER

Bryan Tyler Boerste fell off the roof of his car when a truck driver began to tow it away from a college campus. Seeking to recover for significant head injuries, Boerste sued several defendants in state court. The Defendants removed to federal court because Boerste raised claims under federal as well as state law. Many of the Defendants then moved for summary judgment, including on those federal claims—all of which, it must be said, raise rather unorthodox questions:

1. Did Springfield Police Officer Michael Cotton have a special relationship of control or custody over Boerste that imposed an affirmative duty to intervene and protect Boerste?

2. Did Cotton create or increase the danger Boerste faced when Cotton allegedly ordered Kevin Bewley—the tow-truck driver—to drive off while Boerste was still on top of his car?

3. Did the tow-truck driver, even assuming Cotton's alleged order deputized him as a state agent, also expose Boerste to a state-created danger?

4. Are the City of Springfield, the Springfield Police Department, and Bewley's employer Ellis Towing vicariously liable for the actions of the tow-truck driver and officer on the scene?

Under the law of the Sixth Circuit, the answer to each question is no. And in any event, qualified immunity would protect Cotton and Bewley from liability for their actions, which didn't violate any clearly established law identified by Boerste.

So summary judgment is warranted for all federal claims, which eliminates the basis for federal-court jurisdiction. The theories of substantive due process Boerste relies on, attributed to the Fourteenth Amendment, "d[o] not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327,

332 (1986). Instead, state law supplies most of those rules of conduct and liability—and certainly all the rules that apply in this unfortunate and unusual case. Although the parties raise a number of arguments for and against summary judgment on those state claims, their resolution is far less clear and better suited to state court. So the Court remands the case to Washington Circuit Court for adjudication of the remaining state-law claims.

## I. Summary Judgment Record

Like many accidents, this fall resulted from a series of questionable decisions and strange occurrences—most of which are undisputed.

*First*, drug use on campus. On April 15, 2016, Bryan Tyler Boerste picked up two friends—Isaiah Barron and Makayla Ostertag—so they could visit Seth Mattingly on the campus of St. Catharine College in Springfield, Kentucky. Barron Deposition (DN 188-1) at 28–29; Ostertag Deposition (DN 128-2) at 29–30. The group arrived after dark and stayed in Mattingly's dorm room. Barron Dep. at 43. Boerste and Barron had brought several drugs—cocaine, Xanax, and marijuana—that they and their friends used that night. *Id.* at 34–35, 45–48, 78. Around 7:13 a.m. on April 16th, campus security received a report that Boerste and Barron were attempting to open doors in a dorm and acting in an unusual manner. Joshua Baker Deposition (DN 188-2) at 92, 96.

*Second*, an order to leave. Joshua Baker—a security guard employed by Mattingly Security and a defendant in this case—escorted the pair out, told them to leave, and contacted the Springfield Police Department because he was worried that they were intoxicated. *Id.* at 92, 96, 98–99. Officer Cotton responded to the call and conducted a breathalyzer test, which did not detect alcohol. Cotton Deposition (DN 188-3) at 21–24, 26. Lacking probable cause to make any arrests, Cotton told the group to leave campus. Cotton Incident Report (DN 176-3) at 2. But one of the friends and some belongings remained in the dorm room, so Boerste drove his car to an adjacent parking lot on the campus. Baker Dep. at 115, 121–124. Cotton, at Baker's direction, drove to the other lot and again ordered the men to leave campus. Barron Dep. at 53; Baker Dep. at 115, 121–24, 126; Cotton Dep. at 21–22, 35.

*Third,* a traffic accident. Boerste then drove toward the campus entrance, through a stop sign, and off the pavement onto a steep incline where his car got stuck. Cotton Dep. at 21–22; Baker Dep. at 121–22, 126–27; Barron Dep. at 55–56. Officer Cotton ordered Boerste and Barron out and accused them of having used drugs, which Boerste denied repeatedly. Body Camera (DN 176-5) at 3:05–3:30. When Officer Cotton threatened to get a warrant, Boerste said he wanted to call his father, apparently a police officer in another jurisdiction. *Id.* at 1:53–2:00, 4:11–4:25. Cotton encouraged Boerste to make the call because Cotton believed the friends were too

impaired to drive. *Id.* at 2:50–3:00, 6:06–6:10; Cotton Dep. at 32–34; Response to City's Motion for Summary Judgment (DN 207) at 3.[1]

*Fourth*, an argument over a towed car. A college administrator told Baker to call for a tow truck to haul away Boerste's vehicle. Baker Dep. at 135. Baker contacted Ellis Towing, which sent its driver, Kevin Bewley. *Id.* at 135–39. Officer Cotton remained on the scene to observe, but radioed dispatch advising he was "clear" and could take other calls. Dispatch Call (DN 176-2).[2] Boerste's friends also arrived, saw his car being towed, and became belligerent: they threatened, yelled, and cursed at Officer Cotton, Baker, and Bewley. Ostertag Dep. at 58–60; Baker Dep. at 144–145; Bewley Deposition (DN 188-4) at 40, 47–48, 52.

---

[1] After this opinion issued, Boerste moved to alter or amend it (DN 263) under Federal Rule of Civil Procedure 59(e). The Court grants the motion in part and denies it in part. Boerste first argues that the sentence to which this footnote is appended incorrectly stated that Cotton told Boerste not to push the car back onto the road, when in fact Baker said this. *Id.* at 2–3 (citing Baker Dep. (DN 140-6) at 137–138). Cotton doesn't contest this version of the facts, and the difference doesn't affect this Court's analysis. Cotton Amend Response (DN 266). Second, Boerste contends the Court should've granted summary judgment on the federal claims in favor of Ellis *Towing,* LLC instead of Ellis LLC. Again, no one opposes this clarification. So the Court grants the motion to amend on these two grounds.

Third, Boerste contests the Court's characterization of the record as "undisputed" regarding whether Cotton told dispatchers he was "clear," as discussed in footnote 2 below. Motion to Amend at 4. But Boerste admits he did not contest this for summary-judgment purposes. *Id.* Instead, he merely argues (for the first time) about what Cotton meant when he said he was "clear." *Id.*; *Leisure Caviar, LLC v. U.S. Fish & Wildlife Service*, 616 F.3d 612, 616 (6th Cir. 2010) (Rule 59(e) isn't for new arguments). At least for purposes of summary judgment, Cotton offered evidence that he said he was "clear" and Boerste neither argued nor presented evidence to dispute this. Cotton Amend Response at 2 (citing Dispatch Calls (DN 176-2) Radio Traffic audio at 05:29).

Fourth, Boerste says Bewley never conceded Bewley's status as a state actor, but merely presumed it for purposes of the federal claims. Motion to Amend at 5. But this was Boerste's own framing of the case. *Id.* (admitting this); Complaint ¶¶ 54–56. And Bewley acknowledged that given this record he could not contest at summary judgment that he was a state actor. Hearing Transcript (DN 259) at 31–32. Rather, the issue should go to a jury. *Id.* Given this, the Court's opinion appropriately treated Bewley as a state actor for summary-judgment purposes. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310-311 (6th Cir. 2005) (parties forfeit issues not raised or contested at summary judgment). So the Court denies Boerste's motion on these last two grounds. That denial, however, does not necessarily preclude the parties from presenting new evidence or contesting these issues at trial as the state court deems appropriate.

[2] This message is apparently not audible in the audio recordings in the record, and the body-camera video does not capture this portion of the events. But the parties do not dispute that Cotton told his dispatcher that he was available to leave the campus if another call arrived. *See* Cotton MSJ at 9.

*Fifth*, the decision to climb atop a car sitting atop a tow truck. Boerste climbed onto the roof of his vehicle as Bewley loaded it onto the tow truck. Seth Mattingly Deposition (DN 128-9) at 55–56; Ostertag Dep. at 57; Cotton Dep. at 23. Officer Cotton and Baker told Boerste to get down several times, but he refused. Baker Dep. at 144, 171; Cotton Dep. at 23; Response to City at 4. Boerste's friends stood nearby, recorded Snapchat videos, called Officer Cotton "savage," said Boerste "don't give a f***," and declared that the officers couldn't "take [Boerste's] s***." Snapchat Videos (DN 176-6); Barron Dep. at 59 ("f*** the police.").

*Sixth*, the injury. Bewley climbed into his truck and drove off with Boerste on top of the attached car. Cotton followed close behind in his cruiser. Cotton Dep. at 23–24; Bewley Dep. at 64. Not long after Bewley pulled away, Cotton and Baker saw Boerste either jump or fall off the towed car. Cotton Dep. at 24; Baker Dep. at 147. Boerste landed on the pavement next to a guardrail, causing serious head injuries. Cotton Dep. at 24. Seeing this, Officer Cotton radioed for EMS. *Id.* An air lift rushed Boerste to the University of Louisville Hospital for treatment. First Amended Complaint (DN 1-11) at ¶ 39.

The parties disagree, however, about some of the key interactions before Bewley drove off.

According to Officer Cotton, he didn't instruct Bewley to begin to drive. Cotton Dep. at 23–24. Cotton told the Police Department he never would've given such an order and followed in his car so he could stop Bewley. SPD Interview with Cotton (DN 208-4) at 0:05:50–0:07:33; Cotton Dep. at 24.

Bewley, on the other hand, says he did not know Boerste was still on top and would not have left if he was aware of that. Bewley Dep. at 80–83, 108–109; SPD Interview with Bewley (DN 140-12) at 6:35–7:12. He also contends he did not leave because Cotton told him to, and in fact refused Cotton's requests. Bewley Dep. at 108–09, 127–128 (stating he refused to drive off even though Cotton instructed him to).

Boerste and his friends, for their part, accuse Cotton of telling Bewley to drive off with Boerste on top so Cotton could arrest Boerste on a public road. Ostertag Dep. at 61–62. One friend, Cameron Mattingly (no apparent relation to Defendant Mattingly Security), wrote a statement about the incident: "Tyler gets on the car says you can't take it. Older Officer [Cotton] told the driver to drive off anyway." Kentucky State Police Department Report (DN 208-2) at 5. Allegedly, Cotton did not believe he could arrest Boerste on private property and needed him moved to a public road. *Id.* at 1–4; Baker Dep. at 14. And in fact when Bewley drove off, video shows that Cotton followed behind without stopping Bewley. Library Video (DN 197-4) at 10:07:18–10:08:36.

4

As for Boerste's tumble from the car, the parties again point to conflicting evidence. Not long after Bewley pulled away, Boerste either jumped off the car (according to Cotton) or fell off (according to Baker). *Compare* Cotton Dep. at 24 *with* Baker Dep. at 147.

In considering summary-judgment motions, the Court must view the facts in the light most favorable to the plaintiff. *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 469 (6th Cir. 2002). A reasonable jury could conclude based on this record that Cotton told Bewley to drive off with Boerste on top of the car, that Cotton didn't understand his jurisdiction, and that Bewley followed Cotton's instruction. Response to Cotton's Motion for Summary Judgment (DN 208) at 6–8, 11. Whether a jury would in fact believe that account at trial, and whether those facts would even give rise to a viable legal theory necessitating a trial, are of course separate questions.

## II. This Litigation

Boerste sued several defendants in Washington County Circuit Court: Officer Michael Cotton, the City of Springfield and the Springfield Police Department, Joshua Baker and his employer Mattingly Security, and Kevin Bewley and his alleged employers Ellis Towing and Ellis LLC. Notice of Removal (DN 1) at 1; Complaint ¶¶ 2–9. Boerste's complaint asserted numerous claims, including negligence, intentional infliction of emotional distress, assault and battery against Bewley, various forms of vicarious liability against the employers, and punitive damages. Along with these state-law claims, Boerste also alleged that Officer Cotton and Bewley (as Cotton's agent) "deprived plaintiff of his constitutional rights and equal protection" under 42 U.S.C. § 1983. ¶¶ 54–56. Boerste further claimed that Cotton had a "special relationship" with Boerste, imposing a duty on him to prevent the ensuing harm. ¶¶ 25–28. Finally, Boerste sued the City and Ellis Towing for negligent training, supervision, hiring, and related theories of vicarious liability. ¶¶ 53–57.

The Defendants timely removed the case to federal court based on these federal claims. Notice of Removal at 2. Since then, the parties have filed a tremendous number of motions, many of which have been resolved by multiple district and magistrate judges. Two criminal prosecutions in state court also delayed this litigation. By now, this Court has adopted (DN 250) the recommendations of Magistrate Judge Lindsay (DN 246), over the objection of Boerste (DN 248), to grant some and deny (or deny in part) motions to exclude proposed expert testimony. The Court also resolved a number of non-dispositive motions after the dueling parties spilled a great deal of ink over requests to strike, to sanction, to intervene, and the like. DN 253.

After all of this, eight motions for summary judgment still remained. DN 116, 128, 139, 173, 174, 176, 186, 187. The Court held an in-person hearing on these motions, focusing in particular on the federal claims. DN 253; Hearing Transcript

5

(DN 259).  This Order grants the Defendants' requests for summary judgment on the alleged violations of Boerste's federal Due Process rights and, in the absence of the claims that originally supported federal jurisdiction, remands the remaining state-law claims to state court.

### III. Federal Claims

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  While the Court must view the evidence in the light most favorable to the non-movant, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A. Federal Substantive Due Process Claims

Boerste alleges that Cotton, Bewley, Bewley's employer Ellis Towing, the City of Springfield, and the Springfield Police Department violated his federal constitutional rights.  Notice of Removal ¶ 2.  Boerste's operative complaint asserts that these defendants deprived him of his "constitutional rights and equal protection" and that Cotton had a "special relationship" with Boerste that imposed an affirmative duty on Cotton to protect him.  Complaint ¶¶ 55, 25–28.  No one briefed the equal-protection claim, and Boerste concedes he is not pursuing it.  Tr. at 10.

While Boerste admitted that the special-relationship claim is rather difficult for him to prove, he believes that Cotton had an affirmative duty to stop the tow.  Tr. at 19–22.  Typically, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989) (social services could not be liable for child abuse even though the department had a responsibility to prevent that abuse and had temporary custody of the child before returning him to his abuser).  As a result, most constitutional claims—including so-called substantive due-process claims—require a state actor to take some affirmative action that directly causes the harm.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (police high speed chase caused deadly accident).

But the Sixth Circuit has discussed two exceptions to this general rule: situations in which the state has a special relationship (usually custodial) with someone that requires the government to protect that person, and situations in which the state itself creates—but does not inflict—the danger that ultimately injures the person.  *Schroder v. City of Fort Thomas*, 412 F.3d 724, 727–28 (6th Cir. 2005). These exceptions, however, do not apply here.

6

### 1. Special relationship

In rejecting a general duty to protect, the Supreme Court acknowledged that a state may bear a "special relationship" with some individuals when it "so restrains an individual's liberty that it renders him unable to care for himself."   There the state must "provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200.

The Sixth Circuit, in a case involving facts similar to Boerste's, has explained the limited purchase of substantive due process in this context:

> Except in very limited circumstances, [the Due Process Clause] does not create an obligation on the state to protect individuals from injury to life, liberty or property caused by the acts of private parties, even though such injury might have been avoided by protective state actions. *DeShaney,* 489 U.S. at 196–97.   When the state limits an individual's ability to care for himself by, for example, incarceration in a prison or involuntary confinement in a mental hospital, the Constitution does impose an affirmative duty of care and protection. .… "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."

*Foy v. City of Berea*, 58 F.3d 227, 231 (6th Cir. 1995) (quoting *DeShaney*, 489 U.S. at 199–200).

The Sixth Circuit has defined the degree of "restrain[t]" or "custody" required to trigger this duty as the "intentional application of physical force and show of authority made with the intent of acquiring physical control." *Cartwright v. City of Marine City*, 336 F.3d 487, 491–92 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 505 (6th Cir. 2002)).   Based on this understanding, the Sixth Circuit has, for example, rejected arguments that the state owed a special duty to an inebriated pedestrian to whom police gave a ride but released before he was hit and killed by a truck, *id.*, and to an unconscious person whom medics placed in an ambulance but did not treat, *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005).

So when did the Springfield Police "restrain" Boerste or place him in "custody" sufficient to trigger a "special relationship"?  According to Boerste, either when (1)

Cotton conducted an investigation or (2) Bewley drove off at Cotton's instruction.  Tr. at 14, 21; Boerste's Response to Cotton (DN 208) at 16 n.12.[3]

**a. Investigation.**  The first theory cannot work because Officer Cotton was trying *not* to take control of Boerste; he was in fact trying to persuade Boerste to leave on his own.  *See Brendlin v. California*, 551 U.S. 249, 255 (2007) (Fourth Amendment seizure based on whether reasonable person would feel free to leave).[4]  After Boerste tested negative for intoxication, Cotton told the friends to leave campus.  They weren't just free to leave; they were asked to.  Cotton Dep. at 21; Cotton Incident Report at 2.  This cannot amount to "restraint."

But instead of departing, Boerste drove to another lot, again received an instruction to leave, and then crashed his car.  Baker Dep. at 115, 121–126; Cotton Dep. at 21–22, 35; Barron Dep. at 53.  Even at that point, nothing indicates Cotton prevented the friends from leaving, or failed to protect Boerste during his brief "investigation" of the crash.  Indeed, Cotton acted as if his role had ended: he shut off his camera and radioed dispatch that he was clear to take other calls because he thought his job at the college was done.  *See* above at n.1.  He also encouraged Boerste to call his father for a ride.  Cotton Dep. at 32–34, Response to City at 3.  The point was to facilitate his departure, not require him to stay.  No reasonable person would have believed he was in Cotton's custody and not free to leave.

Instead of calling for a ride, however, Boerste climbed on top of his vehicle and refused to get down, despite several requests from Officer Cotton.  Mattingly Dep. at 55–56; Ostertag Dep. at 57; Cotton Dep. at 23; Baker Dep. at 144, 171; Response to City at 4.  At no point did Cotton intentionally apply any force to or exercise authority over Boerste to acquire physical control over him.  Quite the opposite.

**b. Instruction.**  Boerste's better argument is that the state put him in custody when Bewley drove off at Cotton's direction.  But Boerste also says this is precisely the action that Cotton had a duty to prevent.  Tr. at 19–22.  Surely the duty to intervene cannot be both created and violated by the same act.  How could Cotton have a duty to intervene and stop the tow that itself created that duty?  Nothing indicates that a state actor's use of force—say, an officer's choke hold or knee strike— would trigger a heightened duty by that same officer to intervene and protect the plaintiff from his own choke or strike.  The law plainly doesn't analyze such uses of force as state custody triggering a special relationship of protection; the excessive use of force is itself the constitutional violation, not a precondition for a violation.

---

[3] Boerste's briefing barely argues the special-relationship exception, largely consigning it to a footnote, even though that is the only exception he pled in the complaint.  *See* Response to Cotton at 13, 16 n.12.

[4] The Fourth Amendment seizure and Fourteenth Amendment custody standards are effectively identical in this context.  *See Cartwright*, 336 F.3d at 491–92 (adopting the seizure test by quoting an excessive-force case, *Ewolski*, 287 F.3d at 506).

Boerste's position would collapse the law's separate treatment of the condition creating a special relationship and the action the state must take in response to that relationship. *Compare Cartwright*, 336 F.3d at 491–92 (debating the standard for custody, as distinct from breach), *with Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (debating the standard for breach, as distinct from custody).

Boerste's own theory of the case illustrates the tension inherent in this argument: he says Cotton asked Bewley to drive Boerste from private property to a public road because Cotton wanted—*but did not yet have*—custody over Boerste. Cotton allegedly thought he could arrest Boerste—that is, take him into the state's custody—only if they moved elsewhere. This doesn't show the simultaneous intent and force that the law requires for custody. If Cotton had simply handcuffed Boerste right there, of course, the "special relationship" of control and protection would be far clearer. But this was not the typical case of, say, a detainee who needs medical attention that only the state can provide. *See, e.g., Mays*, 992 F.3d at 300. To the contrary, Boerste's account of the facts indicates Cotton thought he could not arrest Boerste or force him off the car. Response to Cotton at 4–6, 16. While not necessarily dispositive, this illustrates how far Boerste's situation lies from the sort of physical control or show of authority seen in the relatively few "special relationship" decisions found in the caselaw.

When asked for precedent indicating this amounted to custody, Boerste pointed to *Lipman v. Budish*, 974 F.3d 726, 743 (6th Cir. 2020). Tr. at 16. There the Sixth Circuit held that state social workers taking a child to medical appointments for a month did not "'so restrain[ ]' her liberty as to 'render[ ] [her] unable to care for [her]self.'" *Lipman*, 974 F.3d at 743 (quoting *DeShaney*, 489 U.S. at 200). Therefore the state did not take her into custody and create a duty to protect her. *Id.* If anything, this cuts the other way—indicating that short or intermittent control doesn't amount to custody or any other type of special relationship triggering a duty to protect. *See Phila. Police & Fire Ass'n for Handicapped Children v. City of Phila.*, 874 F.2d 156, 168 n.9 (3d Cir. 1989) (even if attending "state-sponsored day programs" amounted to "intermittent custody," that would not create a duty to protect). This is especially true if the plaintiff treats the alleged duty and breach as coterminous: the lack of time between custody and breach means the control is not even "intermittent." An increase in risk does not necessarily render someone incapable of caring for themselves. Nor does it amount to the type of physical restraint or show of authority required for custody.

## 2. **State-created danger**

Perhaps realizing the deficiencies in the special-relationship position, at argument Boerste focused on the second exception to *DeShaney*. Again citing *Lipman*, Boerste's counsel contended that the constitutional protection against a danger the state itself creates better fits the facts of this case. Tr. at 16–17, 22. The state-created-danger theory—an unwritten doctrine of so-called substantive due

process—requires a plaintiff to show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff *would be exposed to an act of violence by a third party*; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright*, 336 F.3d at 493 (emphasis added).[5]

In *Cartwright*, for example, this theory failed for lack of an "affirmative act by the state." *Id.* Police officers found a man wandering intoxicated on a dangerous roadside. He voluntarily rode with them to someplace less dangerous: the parking lot of a convenience store. *Id.* at 489. The officers asked to pat him down before picking up a prisoner, but he refused and the officers left him at the lot. Later he was found dead in the road. His injury resulted from a third party—the driver whose truck struck him—consistent with the notion of a state-created danger. *Id.* But the estate's claim against the officers failed because those state actors didn't affirmatively increase the risk of that injury. *Id.* at 493.

Boerste's first problem is that the state-created danger theory appears nowhere in his pleadings. The City of Springfield raised this omission in its summary-judgment motion, DN 174-1 at 10–11, though it didn't file a motion to dismiss—the normal vehicle for such a contention under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Boerste did not even respond to this argument. *See* Response to City at 12–16. Cotton's motion for summary judgment also raised notice objections to several constitutional theories lodged against him. DN 176-1 at 7–15. In response, Boerste chastised Cotton for "guess[ing] (wrongly) about the core nature of Tyler's federal claim." Response to Cotton at 1, 13, 18, 21, 24. Which is of course the very problem that our pleading precedents are meant to avoid. *See* Cotton Reply (DN 215) at 6 ("[I]f in fact Defendant 'misunderstood' Plaintiff's claims, it is due"—in no small part—"to Plaintiff's failure to adequately and clearly plead them."). Boerste's proposed sur-reply (DN 230-1 at 3) briefly argues that summary judgment is too late to raise pleading concerns, but mostly focuses on the merits. And at the hearing, Boerste admitted that the pleadings were not well pled under federal standards when

---

[5] The Sixth Circuit has recognized this doctrine, but not every circuit has. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). A recent First Circuit decision counted at least nine circuits that had adopted some version of the doctrine and only one that had not. *Irish v. Fowler*, 979 F.3d 65, 73–74 (1st Cir. 2020). But at least one circuit continues to reject the doctrine. *See Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *see also Pinder v. Johnson*, 54 F.3d 1169, 1174–75 (4th Cir. 1995) (seemingly rejecting the doctrine); *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015) (seemingly recognizing but narrowing the doctrine). Among the approving circuits, the tests for liability are not uniform. *See* Christopher M. Eisenhauer, *Police Action and the State-Created Danger Doctrine: Aa Proposed Uniform Test*, 120 Dick. L. Rev. 893, 898–908 (2016); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) (using four factors); *Hart v. Little Rock*, 432 F. 3d 801, 805 (8th Cir. 2005) (using five factors).

filed in state court: at that point, he said, he did not know all the facts. Tr. at 12, 22–26.

This failure to adequately plead that state actors created a danger might itself suffice to enter judgment against Boerste. *See, e.g., Wade v. George*, No. 3:09-cv-531, 2010 WL 2306694, at *2 (W.D. Ky. June 7, 2010) (granting judgment on the pleadings, sua sponte, in favor of a non-moving defendant on claims another defendant successfully moved to dismiss). In light of this shortcoming, Boerste asked the Court to conform the pleadings to the facts as presented on summary judgment. Tr. at 12, 22–26. Some of the Defendants objected—quite reasonably, given the age of this case and Boerste's failure to seek leave to amend in response to the City's or Cotton's initial objection months ago. *Id.* at 28–29.

Regardless of Boerste's late-breaking request, however, the claim would still fail on summary judgment. Boerste lacks evidence that any state actor exposed him to the "violence by a *third* party." *Cartwright*, 336 F.3d at 493 (emphasis added). The "doctrine does not apply where a state actor directly causes the plaintiff's asserted injury." *Rhodes v. Michigan*, 10 F.4th 665, 684 (6th Cir. 2021). To apply it here "would divorce the doctrine from its precedential roots." *Id.* (no state-created danger where two state actors directly caused injuries in a transportation accident). This species of constitutional liability holds a state actor "accountable for harms caused by some external force," but not for "injuries suffered as a direct result of state action," which might give rise to a different sort of claim. *Id.*

Boerste's theory of the case, by contrast, is and has long been that the tow-truck driver operated as a state actor when he drove off at the instruction of a police officer. Complaint ¶ 54; Tr. at 29. When asked at argument to identify the non-state third party who inflicted his injury, Boerste named Bewley. Tr. at 29. But Boerste continued to maintain that Bewley was actually a state actor. *Id.* at 32. And the basis on which Boerste sued Bewley and his employer for constitutional violations under § 1983 was clearly that Bewley acted for the state and harmed Boerste directly, not as a third party who inflicted harm based on a danger the government created or enhanced.

Bewley and Ellis (the towing company that employed Bewley) likewise agreed that they were state actors subject to liability under § 1983. Neither moved to dismiss or for summary judgment based on a lack of state action.[6] The Court explicitly highlighted this question in its order for a hearing and at the hearing itself. DN 253 at 5; *see* FED. R. CIV. P. 56(f) (requiring notice and an opportunity to respond). Yet

---

[6] Boerste also sued Ellis under § 1983 for vicarious liability, which does not exist. Complaint at ¶ 57; *Iqbal*, 556 U.S. at 676–77, 683 (no "vicarious liability" under § 1983, so "each Government official … is only liable for his or her own misconduct"); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992) (when private parties violate the Constitution, their employers are not subject to vicarious liability).

11

Bewley and Ellis didn't dispute their status as state actors, contending instead that the evidence will prove at trial they are not liable either way. Tr. at 31–32. And Boerste agreed. *Id*. So their status as state actors is undisputed.[7] And if Cotton and Bewley are both state actors, no third party exists who could've harmed Boerste—meaning the state-created-danger claim necessarily fails. *See Rhodes*, 10 F.4th at 684. Certainly any such claim leveled against Bewley as a state actor would fail, because he couldn't have created or increased a danger visited by some other third party. No one else caused the harm, and Bewley cannot be a third party to himself.

Boerste's only remaining federal claim against Bewley, therefore, depends on a state-created danger, which cannot exist as a matter of law in the absence of harm inflicted by a third party. Given the lack of a third party here, the federal claims fall short against Cotton and Bewley alike. FED. R. CIV. P. 56(f) (courts may sua sponte grant summary judgment); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (same).

### 3. Oral motion to amend

Facing this shortcoming at argument, Boerste's counsel appeared to have second thoughts: maybe the proper theory of federal liability was not a special duty to protect *or* a state-created third-party danger, but instead a state actor's direct infliction of harm that shocks the conscience. Tr. at 29, 32–33; *Lewis*, 523 U.S. at 850. She asked for the first time to add such a claim by amending the pleadings, Tr. at 29–33—even though Boerste already amended his complaint once in state court and the deadline to amend passed in May of *2018*, DNs 1, 17. When the parties modified that scheduling order, moreover, they left in place the already-passed deadline to amend the pleadings. DNs 42 (motion), 44 (order granting).

It's far too late in the day for an oral motion to amend, during argument, to stave off summary judgment. *See Simpson v. Temple Univ.*, No. 18-cv-2272, 2019 WL 3496206, at *2–3 (E.D. Pa. Aug. 1, 2019) (applying FED. R. CIV. P. 15 to deny leave for tardy amendment). Boerste offered no logical reason or factual support for this "undue delay" in attempting to change his theory. FED. R. CIV. P. 15(a)(2). Unlike the underpled state-created danger theory, which the parties at least fully briefed, no one so much as mentioned *Lewis* until the Court first raised it at argument. Tr. at 12, 29–30. And the caselaw's separate treatment of allegations that state action violates due process by shocking the conscience, the Court noted, illustrates the

---

[7] Absent the parties' agreement, would one instruction from a police officer transform a tow-truck operator into a state actor? The answer to this state-action question is not obvious under Sixth Circuit and Supreme Court caselaw—a point that proves significant in the context of qualified immunity, as discussed below at n.8. *See generally Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). But given the parties' agreement and the lack of evidentiary presentation on this issue, the Court lacks any ground to reject the parties' shared assumption regarding Bewley's role.

incongruity of conflating the state's use of force with state custody or third-party harm. *Id.* at 29. The parties have not raised, briefed, or argued anything resembling a *Lewis* claim.

Equally important, the Defendants would suffer real prejudice if the Court required them to confront a new and unpled constitutional theory *after* they've already completed discovery and fully briefed and argued a raft of summary-judgment and other motions. *See* Fed. R. Civ. P. 15(a)(2); *Com. Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (affirming denial of motion to amend and add a new claim because discovery had ended, motions for summary judgment had been filed, many opportunities to amend had passed, and addressing a new claim at "such a late stage in the litigation" would cause prejudice); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (similar). And courts treat claims as forfeited at summary judgment when they're addressed "in a 'perfunctory manner,' without 'some effort at developed argumentation.'" *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x. 246, 250 (6th Cir. 2009) (quoting *McPherson v. Kelly*, 125 F.3d 989, 995–96 (6th Cir. 1997)). A claim not addressed *at all* presents an even clearer case. So Boerste has forfeited any other constitutional claim (such as a *Lewis* claim) that he conceivably could have raised, but hasn't, against these Defendants.

\* \* \*

Summary judgment is warranted for Cotton on the Fourteenth Amendment claim against him. For the same reasons, judgment in favor of Bewley and Ellis on the same claim is inevitable: Boerste lacks evidence sufficient to prove a constitutional violation.

## B. Qualified Immunity

Even if the special relationship or state-created danger claims survived summary judgment, Officer Cotton would be entitled to qualified immunity. Qualified immunity shields state actors from liability for (1) "discretionary functions" (2) "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Boerste argues that Officer Cotton's actions were not discretionary and that the law was clearly established. Neither contention holds up to scrutiny.[8]

---

[8] To the extent Bewley is considered a state actor exposed to federal claims, qualified immunity would appear to apply in a similar manner. Although the Supreme Court once indicated that private actors could not receive qualified immunity, *see Richardson v. McKnight*, 521 U.S. 399, 409–411 (1997), it has since minimized those rulings. Today the Court looks to history: would a defendant have received immunity when Congress enacted § 1983? *Filarsky v. Delia*, 566 U.S. 377, 387 (2012). At the time, private individuals still

13

### 1. Discretionary or ministerial functions

"Officials generally may assert a qualified immunity defense in all but the narrow class of circumstances in which they perform 'ministerial' functions where the relevant law 'specif[ies] the precise action that the official must take in each instance,' thereby eliminating discretion." *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (quoting *Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984)). Other actions are discretionary, even if authority is "egregiously … abused." *Davis*, 468 U.S. at 196 n.14. The Supreme Court has "been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of

---

carried out many and perhaps most state actions. *Id.* at 387–88. "The common law," the Court has explained, "also extended certain protections to individuals engaged in law enforcement activities," with "[t]he line between public and private policing … frequently hazy. *Id.* at 387. "Private detectives and privately employed patrol personnel," for example, "often were publicly appointed as special policemen," and the government used the posse comitatus (civilians temporarily deputized by a sheriff during emergencies) to arrest people. *Id.* at 387–88.

Assuming (as the parties maintain) that Bewley is a state actor, *see* above at n.7, that status would rest on the help he gave Officer Cotton in order to effectuate Boerste's off-campus arrest. This tracks the historical examples above, and would trigger a standard qualified-immunity analysis. *See Warner v. Grand Cty.*, 57 F.3d 962, 964–65 (10th Cir. 1995) (private person due immunity to the same extent as police officer in strip-search case).

The ambiguity over whether Bewley was a state actor also indicates a lack of clearly established law necessary to deprive Bewley of immunity. *Compare Wilkerson v. Warner*, 545 F. App'x 413, 422 (6th Cir. 2013) (insufficient evidence that an EMT asked for a protestor to be removed and soon after an officer removed the protestor); *Partin v. Davis*, 675 F. App'x 575, 586–87 (6th Cir. 2017) (no state action where a private company with a county towing contract towed a vehicle at the request of a deputy because more than "joint activity" is required); *Banks v. Fedierspiel*, No. 5:10-cv-427, 2011 WL 1325046, at *5 (E.D. Ky. Apr. 1, 2011) ("Private towing companies with whom municipalities contract to tow and impound cars do not become state actors by performing their public contracts."), *with Hensley v. Gassman*, 693 F.3d 681, 691–92 (6th Cir. 2012) (officers' command that tow-truck driver leave with car meant repossession amounted to state action); *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1322 (9th Cir. 1982) (tow-truck operator who towed a vehicle "at the direction of a Los Angeles law enforcement officer" was a state actor); *Huemmer v. Mayor & City Council of Ocean City*, 632 F.2d 371, 372 (4th Cir. 1980) (truck operator, who removed a vehicle pursuant to a municipal ordinance, was a state actor).

In light of this caselaw, the Constitution's applicability to Bewley was hardly clear. *See Moore v. Carpenter*, 404 F.3d 1043, 1045 (8th Cir. 2005) (officers involved in creditor-repossession dispute were immune given lack of clarity regarding fact-specific question whether this amounted to state action). But in the end, the Court need not decide this question, which Bewley has not raised: if Bewley is a *state* actor, Boerste has no claim based on a state-created danger involving a third-party *non*-state actor. And Boerste never even alleges that he had a special relationship with the tow-truck driver that required Bewley to protect him.

various officials' duties or the precise character of the particular rights alleged to have been violated." *Anderson v. Creighton*, 483 U.S. 635, 643 (1987).

Yet Boerste argues Cotton lacked discretion here because (1) "operating a motor vehicle safely is ministerial," Response to Cotton at 22–24, and (2) the police department's policy on handling inebriated people controlled Cotton's actions and likewise rendered them merely ministerial, Tr. at 57–60.

As to the driving argument, Boerste relies on two precedents addressing state (not federal) immunity. In *Pile v. City of Brandenburg*, 215 S.W.3d 36, 40–41 (Ky. 2006) and *Jones v. Lathram*, 150 S.W.3d 50, 53–53 (Ky. 2005), the Kentucky Supreme Court ruled that safely operating a vehicle—even in an emergency—is ministerial, at least if the officer violates clear policies and traffic laws in the run-up to a crash. Boerste asserts that Bewley driving off with him on the roof of the car is no less ministerial than negligent driving. Response to Cotton at 21–24. Or, viewing the situation from Cotton's perspective, that instructing Bewley to drive away was akin to ordering a drunk driver to take off. *Id.* at 23.

But regardless of the contours of state immunity doctrine, federal law governs this federal constitutional claim. And Boerste hasn't cited any federal precedent indicating that directing the operation of a vehicle is ministerial.

In fact, the Sixth Circuit has held that ordering an intoxicated person to drive away is *not* a state-created danger under federal law and *is* protected by qualified immunity. In *Koulta v. Merciez*, the Court of Appeals held that an officer who told a drunk driver to drive away before the driver caused a crash did not violate the Constitution and was entitled to qualified immunity. 477 F.3d 442, 445–48 (6th Cir. 2007). Although the opinion didn't discuss whether the action was ministerial or discretionary, it did grant qualified immunity—which necessarily implies the action was discretionary. *Id.*; *see also Foy v. City of Berea*, 58 F.3d 227, 231 (6th Cir. 1995) (ordering a drunk driver to leave did not violate a decedent's right to substantive due process).

Other circuits have ruled similarly in granting qualified immunity to officers who caused crashes by breaking traffic laws or violating police policies during pursuits. *See Green v. Post*, 574 F.3d 1294, 1304 (10th Cir. 2009) (immunity for officer who caused crash in pursuit of a petty thief); *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 719–20 (3d Cir. 2018) (immunity against state-created danger claim for officer driving 100 mph who caused crash). Driving, even in violation of safety laws, can be and often is discretionary under these federal principles. So even assuming Boerste's reading of Kentucky precedent is correct, those decisions would set forth a more restrictive rule than federal law—and therefore would not control here. *See T.S. v. Doe*, 742 F.3d 632, 640–42 (6th Cir. 2014) (distinguishing federal and state immunity law regarding strip searches to grant (less restrictive) federal qualified immunity law on federal claims but deny state qualified immunity on state claims).

The more fundamental problem, however, is that driving is not the act that Boerste is really complaining about. He alleges "that Officer Cotton direct[ed] Bewley to drive off while [Boerste] was atop his car atop Bewley's tow truck," so Cotton could arrest Boerste on a public road (or, alternatively, that Cotton did not stop the tow). Response to Cotton at 22, 24. Nothing about those actions deal with driving itself. Rather, Cotton's actions reflect discretionary choices about whether and where to arrest or otherwise handle an inebriated individual surrounded by belligerent friends.

Such choices, even if far from perfect in hindsight, are classic exercises of discretion under federal law. *See Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) ("Although calling for mandatory arrests ('shall'), the statute also requires the police officer to have 'reasonable cause' to arrest, which requires a police officer to exercise at least some discretion" (footnote omitted)). Even if Boerste were right to look to state immunity law, moreover, those precedents point the same direction. *See, e.g., Hartman v. Thompson*, No. 3:16-cv-114, 2018 WL 793440, at *6–7 (W.D. Ky. Feb. 7, 2018) (arrests governed by Kentucky statutory law are discretionary under federal *and* state law), *aff'd*, 931 F.3d 471 (6th Cir. 2019); *Jones v. Bennett*, 2016 WL 4487189, at *2 (Ky. Aug. 25, 2016) ("Decisions about how to investigate and apprehend a criminal suspect are an example of discretionary conduct warranting qualified immunity").

Cotton repeatedly asked Boerste to leave the roof of the car and call his father. Baker Dep. at 143–44, 171; Cotton Dep. at 23, 32–34; Response to City at 4. Only after these attempts to induce compliance did Cotton (on Boerste's telling) ask Bewley to drive off so he could then arrest Boerste on a public road. Ostertag Dep. at 61–62. Every choice in this progression required Cotton to exercise judgment between competing options. *See T.S.*, 742 F.3d at 641 (discretion involves "personal deliberation, decision, and judgment") (quotation omitted).

How could the management of this complex situation amount to a ministerial implementation of police policy, as Boerste contends? Tr. at 57–60. The policy Cotton allegedly violated instructs officers in broad terms that necessarily afford discretion to those on the scene: "not expos[ing] people to dangerous situations," acknowledging that intoxicated people may exhibit a "wide range of behaviors," "resolv[ing] the encounter in the safest manner," and "control[ling] the incident." *Id.*[9] The policy didn't tell Cotton whether or when to arrest Boerste or his friends, call their parents, or tow the car. Could and perhaps should Cotton have handled the situation differently? Of course. But that is not the relevant inquiry.

So qualified immunity can apply to the constitutional claim against Cotton because he took discretionary rather than ministerial action under federal law.

_____

[9] Notably, Boerste never identified any specific policy that Cotton allegedly transgressed until oral argument on this motion.

Nothing about the Springfield Police policies Boerste relies on "specif[ied] the precise action" Cotton would have to take "in each instance." *Davis*, 468 U.S. at 196 n.14. Quite the opposite. Such phrases are quintessential examples of discretion, as officers must make choices under a wide variety of circumstances. Otherwise, any department with a general excessive-force policy would render fact-specific choices ministerial. *See, e.g, Reich v. City of Elizabethtown*, 945 F.3d 968, 978, 982–84 (6th Cir. 2019) (granting federal and state immunity on excessive-force claims based in part on the discretionary nature of the use of force despite a controlling state statute).

## 2.  Clearly established law

The remaining question is whether Cotton violated law that was clearly established at the time of the incident.

"[T]he sine qua non of the 'clearly established' inquiry is 'fair warning.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 827 (6th Cir. 2019) (quotation omitted). Officials must be "on notice [that] their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). The standard extends broadly to "all but the plainly incompetent or those who knowingly violate the law." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Courts "do not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). But they do require that existing precedent place the "question beyond debate," such that "'the contours [of a right] are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Anderson*, 483 U.S. at 640).

To ensure that "every reasonable official" would understand the illegality of the conduct, *Wesby*, 138 S. Ct. at 590, "the clearly established right must be defined with specificity," *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). And "specificity is especially important" in contexts akin to this one that make it "difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted) (highlighting the needed specificity under the excessive-force doctrine of the Fourth Amendment); *see also Wesby*, 138 S. Ct. at 590 (similar).

Courts use caselaw to assess whether officers could've determined the lawfulness of their conduct. A "plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992–93 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). This is a high hurdle, cleared only if all reasonable officials would know their conduct was unlawful based on "'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42). This specificity is

especially important in the context of substantive due process. Because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," "self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Other judges, extending the geographic metaphor, have hesitated to "wade into the murky waters of that most amorphous of constitutional doctrines, substantive due process." *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005) (granting qualified immunity as alternative basis for decision); *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (describing "murky" doctrinal "waters" of substantive due process).

Rather than providing "a case with a similar fact pattern," *Arrington-Bey*, 858 F.3d at 992–993, however, Boerste admits he knows of none, Tr. at 36; Response to Cotton at 19. Instead, Boerste paraphrases the Declaration of Independence for the "clearly known" proposition that "life, limb, security, and personal happiness" should not be threatened. Tr. at 36. Given this absence of *constitutional* law and caselaw, the Court lacks any basis to conclude that Cotton violated Boerste's substantive-due-process rights that were clearly established at the time of the incident.

**a. Special relationship.** This line of authority applies only when an individual is in "custody." *Cartwright*, 336 F.3d at 491–92. As discussed above, the Sixth Circuit defines this species of Fourteenth Amendment custody as the "intentional application of physical force and show of authority made with the intent of acquiring physical control." *Cartwright*, 336 F.3d at 491–92 (quotation omitted). This standard resembles that applied to determine custody in the Fourth and Fifth Amendment contexts, which the Supreme Court has described as highly fact specific, rendering similar precedent essential. *See id.* (quoting *Ewolski*, 287 F.3d at 506 (excessive force)); *Mullenix*, 577 U.S. at 12 (highlighting similar need for specificity under Fourth Amendment excessive-force doctrine).

How the custody standard applies here is far from clear. Cotton repeatedly asked Boerste to get off his car and leave before allegedly telling Bewley to drive off. Cotton may have *wanted* to acquire physical control of Boerste by arresting him, but the constitutional standard requires both intent and force. *Cartwright*, 336 F.3d at 491–92 ("intentional application of physical force and show of authority made with the intent of acquiring physical control"). Cotton apparently believed he could not lawfully control Boerste on campus. State Police Report at 1–4; Baker Dep. at 14. This raises obvious problems under the Sixth Circuit's definition of custody.

But did Cotton intentionally exercise control of Boerste for a brief period of time in order to move Boerste off campus? As discussed above, Cotton's requests for Boerste to get down and go home suggest not. And even if we assume some measure of control or attempted control, case law indicates that intermittent control does not amount to custody. *See Lipman*, 974 F.3d at 743 (a child protective services worker's taking a child to medical appointments for a month did not "'so restrain[]' the child's liberty as to 'render[] her unable to care for [her]self'") (quoting *DeShaney*, 489 U.S.

at 200).[10]  If Cotton's actions somehow cross this fuzzy line and amount to custody, they do so only barely.  And Boerste cites no similar case that would've put Cotton on notice of that.  Uncertainty about the legal standard compounds the uncertainty of its application to these specific facts.  *See Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 433 (4th Cir. 2020) (Richardson, J. dissenting) (when the standard and its application are uncertain, the uncertainty aggregates).

Due to the "amorphous" nature of the doctrine and the peculiar facts of this case, *Tun*, 398 F.3d at 900, Cotton's conduct in 2016 did not clearly violate Fourteenth Amendment protections due persons in a special relationship with the state, *Lipman*, 974 F.3d at 743.[11]

**b. State-Created Danger**.  Only recently did the Sixth Circuit specify that a state-created-danger claim required that a non-state, third-party actor had to directly cause the harm.  *See Rhodes*, 10 F.4th at 683–84.  And who counts as a state actor depends on a fact-specific inquiry.  *See Chapman*, 319 F.3d at 834 ("case-by-case"); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("[a]midst such variety [of tests], examples may be the best teachers.").  Given the lack of similar precedents, Cotton (or Bewley) would've struggled to determine whether Bewley was a state actor, or how that affected their relative liability in this case.  *See Moore*, 404 F.3d at 1045 (officers immune given lack of clarity regarding fact-specific question whether officer involvement in dispute during creditor repossession amounted to state action).

Even if the legal standard had been clearly established, moreover, its factual application might not be.  "Though the elements of the state-created danger test are clearly established, it also must be clear to which fact scenarios and government actors we apply the test."  *Estate of Reat v. Rodriguez*, 824 F.3d 960, 965–67 (10th Cir. 2016) (not clearly established that a 911 operator could create a state-created danger, or that operator's instruction that driver return to dangerous area could amount to custody).

The Sixth Circuit has granted qualified immunity in state-created danger cases where the "exact (or even vaguely similar) circumstances" had never arisen

---

[10] Boerste argues that *Lipman* clearly establishes that Officer Cotton's actions amounted to a state-created danger. Tr. at 37, 62. But this decision came in 2020, so it cannot establish that the law was clearly established at the time of the incident in 2016. *See Wesby*, 138 S. Ct. at 589. What it *can* do is show that custody was not clearly established. Because if *Lipman* held the plaintiff was *not* considered in custody as of 2020, then the law surely wasn't clearly established in 2016 that Cotton placed Boerste in custody.

[11] Boerste's response does not argue that the applicability of the special-relationship doctrine to the facts of this case was clearly established. Response to Cotton at 18–20. In fact, it barely argues for a special relationship at all. *Id*. at 14–20. Instead, his brief focuses on state-created danger. *Id*.

before. *Jackson*, 429 F.3d at 592.  In that decision, the court held that no "exact" case applied to an EMS team's decision to put the plaintiff in their ambulance without doing anything to save him.  In *Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021), the officers' role in increasing the risk of suicide was not clearly established as a state-created danger, given that the specific issue had not previously arisen in the same way.  And in *Jasinski v. Tyler*, 729 F.3d 531, 540 (6th Cir. 2013), the court noted that substantive-due-process doctrine was not sufficiently clear to conclude that government's failure to deal with a specific child-abuse situation was clearly established.  So when previous applications of even a clear standard "are simply too factually distinct to speak clearly to the specific circumstances here," qualified immunity applies.  *Mullenix*, 577 U.S. at 18.

Boerste has certainly not provided "a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey*, 858 F.3d at 992–93 (quoting *White*, 137 S. Ct. at 552).  As Boerste admits, no precedents approach this factual situation, whether within the circuit or without.  Tr. at 36; Response to Cotton at 19.  Boerste says only that the law is clearly established based on general principles extracted from the words, not the facts, of prior precedents: "a police officer deprives someone of due process by taking an affirmative action that creates or increases specific danger of third-party violence," Response to Cotton at 19; "[t]he focus is was [Cotton] in a position of clearly known threat to life, limb, security, and personal happiness," Tr. at 36–37; it is illegal to "increase[e] the risk of harm," *id*. at 29, and the Fourteenth Amendment protects a right to "personal security and to bodily integrity," *id*. at 63.

But this is precisely what the Supreme Court has warned courts against: defining rights at the "high level of generality" Boerste urges.  *E.g.*, *City of Escondido*, 139 S. Ct. at 503; *Mullenix*, 577 U.S. at 12.  Another district court addressing a state-created-danger theory noted that even though, "at a general level, the rights identified by plaintiffs—'freedom from abuse, corporal punishment, and excessive force'—were clearly established," the qualified-immunity caselaw demanded more before the court could impose liability.  *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, No. 5:18-cv-577, 2020 WL 2043321, at *22 (N.D. Ohio Apr. 28, 2020).  These rights were not sufficiently "particularized" to the facts at issue, and therefore the law was not clearly established, given the lack of cases in which "school officials were held responsible for failing to prevent an imposter posing as a police officer from abusing a child."  *Id*.  So qualified immunity protected the defendant, a teacher, who facilitated allegedly abusive "scared straight" tactics on her students.  *Id*.  So too here.  Boerste's proposed rules are far too general.  Boerste identifies no caselaw even close

to the "high degree of specificity," *Wesby*, 138 S. Ct. at 589–90, required for this Court to find Cotton violated law that was clearly established as of 2016.[12]

The uniqueness of this situation is worth reemphasizing: after responding to a report of disorderly students on campus, the situation facing Cotton escalated significantly when the school called a tow truck and Boerste, in protest, climbed on top of his car while Bewley secured it to the truck. Baker Dep. at 135–39; Mattingly Dep. at 55–56; Ostertag Dep. at 57; Cotton Dep. at 23. Boerste and his friends yelled profanities and tried to obstruct the tow. Ostertag Dep. at 58–59, 60; Baker Dep. at 144–145; Bewley Dep. at 40, 47–48, 52; Snapchat Videos; Barron Dep. at 59. Cotton's involvement in these events was largely limited and reactive, rather than "affirmative" and "specific," as the law requires for liability. *Cartwright*, 336 F.3d at 493; *see also Koulta*, 477 F.3d at 445–46 (order to drive didn't amount to affirmative act under state-created-danger theory). He asked Boerste several times to climb down from the car and check whether his father would get him. Baker Dep. at 144, 171; Cotton Dep. at 23, 32–34; Response to City at 4. Only when this approach failed did Cotton allegedly tell Bewley to drive off while Boerste was still on top, purportedly in order to arrest Boerste on a public road. SPD Interview with Bewley at 6:35–7:12; Ostertag Dep. at 61–62; State Police Report at 5. Nothing here stands out as an affirmative, clear constitutional violation. Much, by contrast, is bizarre and unprecedented.

*Foy v. City of Berea* is the most factually similar precedent the parties have identified—and it cuts against Boerste. 58 F.3d 227, 231 (6th Cir. 1995). That case also involved friends, intoxication, a campus trip, and a car crash. Two young men visited mutual friends at an Ohio college after a day of drinking. *Id*. at 228. Security, notified of a false fire alarm, confronted the friends and contacted law enforcement. *Id*. Police arrived, determined the friends were drunk, and ordered the friends to either leave campus or face arrest. *Id*. They drove off, crashed into a truck on the highway, and killed one of the friends. *Id*.

The decedent's estate sued the officers for violating substantive due process by ordering a drunk person to drive away, increasing the risk to his passenger. *Id*. at 229–30. Noting the Supreme Court's "reluctan[ce] to expand the concept of

---

[12] At points Boerste hints that a violation was "obvious" regardless of precedent, though he never directly advances this position. Response to Cotton at 20. For good reason. The Supreme Court has only applied that test twice—both times in the context of appalling and intentional prison abuse. *Taylor v. Riojas*, 141 S. Ct. 52 (2020), *summarily reversing* 946 F.3d 211 (5th Cir. 2019) (prisoner housed in feces covered solitary confinement cell for days); *McCoy v. Alamu*, —— U.S. ——, 141 S. Ct. 1364 (2021), *granting, vacating, and remanding* 950 F.3d 226 (5th Cir. 2020) (guard gratuitously pepper-sprayed a prisoner). By their nature, these cases are far removed from the day-to-day choices an officer makes in the field, especially when dealing with a claim as amorphous as state-created danger. *See Ramirez v. Guadarrama*, 2 F.4th 506, 514–15 (5th Cir. 2021) (Oldham, J. concurring in the denial of rehearing en banc). Neither example remotely resembles the situation here.

substantive due process," the Sixth Circuit rejected the notion that the officers exercised custody over the friends, bore responsibility for the risk that materialized during the fatal car crash, or (much less) violated clearly established law to that effect:

> [N]either the Supreme Court nor this court had held that police officers commit a substantive due process violation if, after receiving complaints from the owner of property that intoxicated persons are causing a disturbance on that property, the officers command these individuals to leave the property and the intruders are injured later by their own actions or those of other private parties. In fact, we find no controlling authority holding that such action by police under generally similar circumstances would constitute a due process violation. ***

> Here, the defendant police officers did nothing to prevent Foy from protecting himself. Foy and Phillips were free to pull into a local motel or get out of the car once they left the campus. The police did not command them to undertake the long journey back to Crestline, Ohio; only to leave the Baldwin-Wallace campus. The officers may have used bad judgment in telling Foy and Phillips to get in the car and leave, but this command was not an example of arbitrary exercise of the state's power. Neither Foy nor Phillips was ever in custody. No action of the officers deprived Foy and Phillips of the ability to care for themselves.

*Id.* at 229, 232–33. While the facts in Boerste's case may be further along the line, the *Foy* decision helps explain why they remain far from a violation of clearly established law.

* * *

Ordering a tow truck to drive off while an apparently intoxicated person sat on top of a car (if that's what happened) was unwise and possibly illegal. *See* Tr. at 4, 9–10; DNs 52, 53 (grand jury charged Cotton and Bewley, who both entered *Alford* pleas). Certainly it's easy to imagine how the situation at St. Catherine's College could've taken a different and likely safer course. The Constitution, however, is not a "font of tort law" designed to remedy every wrong. *Lewis*, 523 U.S. at 848. Other laws—state tort law and criminal proceedings, for example—may prove a better fit.

So while Boerste's situation may well deserve sympathy, that is not the question the law asks of a federal judge in this situation. Qualified immunity often arises under terrible facts in which officers, at least in hindsight, seem to have made mistakes that were tragic, terrible, and even illegal. Yet courts following binding precedent still often grant immunity because no specific constitutional violation is clear based on those facts and then-existing precedent. Qualified immunity is, almost

22

by definition, more significant for conduct that may be dubious than for conduct that is commendable.

Otherwise the Federal Reports wouldn't contain cringeworthy fact patterns like the one found in a recent Ninth Circuit qualified-immunity affirmance: officers should have realized stealing property worth $250,000 while executing a warrant was "morally wrong" (to say the least), yet immunity applied because "they did not have clear notice that it violated the Fourth Amendment—which … is a different question." *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019).[13] Nothing about Cotton's alleged command and Bewley's decision to press the gas pedal matches any precedent Boerste has cited. *See Wesby*, 138 S. Ct. at 589–90 (requiring "a body of relevant case law"). To the contrary, many aspects about these events reflect an exercise of discretion under circumstances that are unlikely to be found in the law books. *See Moore*, 404 F.3d at 1045 (officers "required to make a close decision in the midst of a repossession fracas" could not have determined they were liable). Granting summary judgment for Cotton in these circumstances is far different from condoning these actions. Rather, that decision merely respects binding precedent indicating Cotton did not violate clearly established constitutional law.

## C. Municipal liability

Boerste also alleged that the City of Springfield and its police department are liable for Officer Cotton's actions. Without an underlying constitutional violation, however, there can be no municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 693–94 (1978). *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 471 (6th Cir. 2006). Even assuming Cotton were subject to liability, however, Boerste admitted at argument that his claims against the City of Springfield and its police department are "holding on by a thread." Tr. at 12.

That thread has snapped. The Constitution doesn't create vicarious liability, so any municipal liability must rest on a policy or custom the government adopted or ratified that caused the harm inflicted by its employees. *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Plaintiffs "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [their]] particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003). "Where the identified policy is itself facially lawful," plaintiffs "'must demonstrate that the municipal action was taken with 'deliberate indifference' as to

---

[13] Thoughtful scholars disagree strongly over the textual, historical, and prudential soundness of contemporary qualified-immunity doctrine. *Compare, e.g.*, William Baude, *Is Qualified Immunity Unlawful*, 106 CAL L. REV. 45 (2018), *with* Andrew S. Oldham, *Official Immunity at the Founding* (April 12, 2021), available at SSRN: https://ssrn.com/abstract=3824983. For judges applying that doctrine, however, qualified immunity remains "controversial, contested, and *binding*." *McKinney*, 976 F.3d at 422 (Richardson, J., dissenting) (emphasis in original).

its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

Boerste's primary claim is that the city failed to train Officer Cotton by not adequately supervising him regarding the scope of his jurisdiction. This omission, Boerste contends, caused him to mistakenly believe he couldn't arrest Boerste on private property and therefore ask Bewley to drive him to a public road in order to make the arrest. Response to City at 14–16. Oddly, Boerste does not allege Cotton was not adequately *trained* on his jurisdiction, just that he was not *supervised* to ensure he understood his training. Response to City at 8–9, 14.

A failure-to-train or -supervise claim requires a plaintiff to establish that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); Response to City at 13–15 (making a mixed training and supervision claim that relies on this standard). Boerste identifies no evidence of any lack of training or supervision. Instead he tries to flip the burden, contending the government lacks evidence that he *was* supervised. Response to City at 9–10. This is backwards. Boerste has the burden to show a lack of training (or supervision), not the other way around. Even so, evidence shows that a supervisor signed Cotton's reports and that Springfield trained its officers on their jurisdiction. Gaut Deposition (DN 220-1) at 35–37, 41; Tony Golden Deposition (DN 220-3) at 8; Carrico Deposition (DN 220-3) at 11.

Boerste's only countervailing evidence comes from an expert witness who says supervision is important. Response to City at 13–14 (citing Gaut Dep. at 25, 42–43). Indeed it is. But that witness also recognizes that a municipality cannot constantly keep an officer under supervision. Gaut Dep. 35, 37. And neither Gaut nor Boerste's experts ever said the city's policies or supervision were faulty. None of this evidence speaks to the "adequacy of the training program in relation to the tasks the particular officers must perform" in situations such as this one. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

In addition, a failure-to-train (or supervise) claim depends on a showing of deliberate indifference, which imposes "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Brown,* 520 U.S. at 410. In other words, a "risk of a constitutional violation arising as a result of" the inadequate training that is "plainly obvious." *Gregory*, 444 F.3d at 752. A plaintiff could potentially make this showing in two ways.

*First*, a plaintiff can show "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it." *Jackson*, 925 F.3d at 836 (quotation omitted). The

Supreme Court has said this "is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62 (quotation omitted). Boerste admits he cannot show similar failings, while the City offers testimony from several officers that they understood their jurisdiction with respect to the college. Response to City at 14; Golden Dep. at 8; Carrico Dep. at 11–12.

*Second*, the Supreme Court has not foreclosed, and the Sixth Circuit has accepted, the possibility that a plaintiff could provide "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Jackson*, 925 F.3d at 836 (quotation omitted). The Supreme Court has observed that a plaintiff might show this in a "narrow range of circumstances." *Connick*, 563 U.S. at 63. And these circumstances, according to the Sixth Circuit, would involve a "complete failure to train the [officers], training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell County*, 453 F. App'x 557, 567 (6th Cir. 2011). Boerste argues that this applies because an officer's ignorance of his jurisdiction will likely lead to other violations or concerns, such as failing to arrest a domestic abuser. Response to City at 15–16.

Boerste's speculation about Springfield's training bears no resemblance to the Sixth Circuit's contemplation of "single violation" *Monell* claims. In *Jackson*, 925 F.3d at 836, and *Gregory*, 444 F.3d at 753–56, on which Boerste relies, the alleged failure to train concerned *Brady* disclosures, which several officers admitted they had never been trained on. *Brady* issues are common and the violations that could stem from a failure to train are obvious. Here, however, no officer has said Springfield hasn't trained or supervised them. Quite the opposite. *See* Gaut Dep. at 35–37, 41; Golden Dep. at 8; Carrico Dep. at 11. And even assuming they'd received no training regarding their jurisdiction, it is unclear when and how this omission would lead to constitutional violations.

How often could a failure to understand one's jurisdiction lead to future state-created dangers? Boerste never says. Even the examples he does give would not amount to constitutional violations; a failure to arrest an abuser, for example, falls squarely under *Deshaney* and outside the Constitution. *See* Response to City at 15. So Boerste cannot show that Springfield was deliberately indifferent in training or supervising its officers on their jurisdiction.[14]

---

[14] To the extent Boerste, notwithstanding his briefing, advances a pure negligent hiring claim, this would raise constitutional concerns only if "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right...." *Bryan County v. Brown*, 520 U.S. 397, 411 (1997) (negligent screening of officer with some misdemeanor issues was not sufficient to show negligent hiring

### III.    Remand of State Claims

Although a Court may retain supplemental jurisdiction over state claims after dismissing federal claims, "the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) (citing 28 U.S.C. § 1367(c)(3)). "[F]ederal judges must not needlessly decide" difficult questions of state law. *Kowall v. Benson*, 18 F.4th 542, 549 (6th Cir. 2021) (vacating and remanding).   That course is appropriate here, based on the Court's review of the pending state-law claims and motions.   So absent any remaining federal claims, the Court remands the remaining claims to state court, where Boerste filed this case at the outset.

### IV.    Conclusion

The facts of this case are tragic.   But the U.S. Constitution does not remedy every tragedy that befalls those of us who live within its reach.   Fortunately for plaintiffs like Boerste, we enjoy legal protections beyond those set forth in the Constitution's concise federal protections; state law generally supplies a broader and more specific set of rights and remedies.

Now Boerste will have a chance to satisfy a judge or jury in state court that those laws protected him from the actions that led to his injury.   The Court grants in part the City of Springfield's Motion for Summary Judgment (DN 174) and Officer Cotton's Motion for Summary Judgment (DN 176) on the federal claims, grants judgment in favor of Bewley and Ellis Towing, LLC as a necessary consequence of the disposition of Cotton's motion, Fed. R. Civ. P. 56(f), and remands the remaining state claims and the rest of the case to state court.

Benjamin Beaton, District Judge
United States District Court

June 16, 2022

---

in excessive -force context).   Here, no evidence shows any complaints or issues with Officer Cotton or similar instances with other officers that would put the city on notice of a potential constitutional issue.   Smith Dep. at 101, 105, 145, 149, 198 (police chief knew Cotton personally, ensured he had received training and experience, and reviewed his employment history); Gaut Dep. at 37 (Cotton had no complaints and some commendations).